# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-762

JOSEPH LIONEL MELANCON, ET AL.

VERSUS

LAFAYETTE INSURANCE COMPANY, ET AL.

************

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT,
PARISH OF ST. LANDRY, NO. 02-C-1532-B,
HONORABLE AARON FRANK MCGEE, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of John D. Saunders, Michael G. Sullivan, and J. David Painter, Judges.

**AFFIRMED.**

Patrick C. Morrow, Sr.
James S. Gates
Morrow, Morrow, Ryan & Bassett
Post Office Box 1787
Opelousas, Louisiana 70570
(337) 948-4483
Counsel for Plaintiffs/Appellees/Appellants:
    Joseph Lionel Melancon
    Bernita Norman Melancon

David A. Hurlburt
George D. Ernest, III
Hurlburt, Privat & Monrose
Post Office Drawer 4407
Lafayette, Louisiana 70502
(337) 237-0261
Counsel for Defendants/Appellees:
    T & J Ford Mercury
    Sentry Select Insurance Company

Howard B. Kaplan
Bernard, Cassisa, Elliott and Davis
Post Office Box 55490
Metairie, Louisiana  70055-5490
(504) 834-2612
Counsel for Defendants/Appellants/Appellees:
     Lafayette Insurance Company
     Robert C. Ardoin
     Evangeline Gas Company, Inc.

Kraig T. Strenge
Attorney at Law
515 W. University Avenue
Lafayette, Louisiana  70506
(337) 261-9722
Counsel for Defendants/Appellants/Appellees:
     Evangeline Gas Company, Inc.
     Robert C. Ardoin
     Lafayette Insurance Company

Leah B. Guilbeau
John E. Ortego & Associates
4023 Ambassador Caffery, Suite 100
Lafayette, Louisiana  70503
(337) 988-7240
Counsel for Defendant/Appellee:
     State Farm Mutual Automobile Insurance Company

Darrell R. Sims
Law Offices of Keith S. Giardina
9100 Bluebonnet Centre Blvd., Suite 300
Baton Rouge, Louisiana  70809
(225) 293-7272
Counsel for Intervenor/Appellee:
     Liberty Mutual Insurance Company
     United Parcel Service

SULLIVAN, Judge.

Plaintiffs and Defendants appeal in this personal injury action. We affirm.

***Facts***

On February 13, 2002, Robert Ardoin backed into a UPS truck parked in the parking lot of T & J Ford-Mercury, Inc. (T & J Ford) in Ville Platte, causing the driver-deliveryman, Lionel Melancon, to fall from the truck onto the ground and injure himself. Mr. Melancon injured his right hand, back, and right leg when he fell. Mr. Melancon and his wife sued T & J Ford, Mr. Ardoin, his employer, Evangeline Gas Company, and its liability insurer, Lafayette Insurance Company, for damages they suffered as a result of Mr. Melancon's injuries. Mr. Ardoin, Evangeline Gas Company, and Lafayette Insurance Company (hereinafter collectively referred to as Defendants) answered the Melancons' petition, alleging affirmative defenses of negligence on the part Mr. Melancon and T & J Ford.

The matter was tried before a jury for four days from August 16, 2004 through August 19, 2004. When Plaintiffs rested their case, T & J Ford moved for a directed verdict, which the trial court granted. After deliberating, the jury returned a verdict in favor of the Melancons against Defendants, assessing 100% fault to Defendants and awarding the Melancons the following damages:

**Mr. Melancon**

| | |
|---|---|
| Past pain, suffering and mental anguish | $ 137,500.00 |
| Future pain, suffering and mental anguish | $ 137,500.00 |
| Disfigurement and physical disability | $ 137,500.00 |
| Loss of enjoyment of life | $ 137,500.00 |
| Past medical expenses | $  41,181.00 |
| Future medical expenses | $ 257,000.00 |
| Past loss of earnings | $ 170,000.00 |
| Future loss of earnings/loss of earning capacity | $ 755,000.00 |

**Mrs. Melancon**

Loss of consortium, love, companionship,          $ 10,000.00
affection, and services of Mr. Melancon

Defendants assign eight errors; Plaintiffs assign three errors. For the following reasons, we affirm both the trial court's grant of directed verdict in favor of T & J Ford and the jury's verdict.

## *Issues*

Defendants assign the following errors:

1.    The trial court erred in allowing Glen Hebert to testify as to medical treatment and costs which were not disclosed prior to trial.

2.    The trial court committed legal error in failing to allow evidence of actual medical bills which would directly affect the calculation of future medical expenses.

3.    The jury was clearly wrong in awarding $257,000.00 in future medical expenses.

4.    The trial court was wrong to award amounts of medical bills that were not actually paid.

5.    The jury was clearly wrong in awarding $550,000.00 in general damages for a one-level laminectomy.

6.    The trial court committed legal error in granting a directed verdict in favor of T & J Ford.

7.    The trial court committed legal error in jury selection which directly affected the verdict in this case.

8.    The trial court improperly allowed Plaintiffs to advise the jury that assigning fault to Mr. Melancon would reduce his recovery.

Plaintiffs assign three errors:

1.    The jury's award of $170,000.00 for past loss of earnings was manifestly erroneous.

2. The jury's award of $755,000.00 for future loss of earnings/loss of earning capacity was manifestly erroneous.

3. The jury's award of $10,000.00 to Bernita Melancon for the loss of her husband's consortium was abusively low.

## Standard of Review

The jury's verdict is reviewed for manifest error; if there is a reasonable basis in the record for the jury's determination, we must affirm the verdict even if we would have made a different finding. *Guidry v. Dwight Manuel, Inc.*, 04-2031 (La. 11/17/04), 887 So.2d 456. The trial court's grant of directed verdict is subject to a *de novo* review. *Hall v. Folger Coffee Co.*, 03-1734 (La. 4/14/04), 874 So.2d 90.

## Discussion

### Background

Mr. Melancon married Bernita, his grade-school classmate, shortly after they graduated from high school. They have been married for thirty years and have three adult children and three grandchildren. Mr. Melancon worked for UPS for nineteen years and eleven months before his accident. At the time of his accident, he was earning $23.82 per hour together with generous fringe benefits. He is a member of the Teamster's Union. The Union's employment contract with UPS guarantees its members annual wage increases and provides them one of the best fringe benefits packages in the nation.

The evidence established that Mr. Melancon has always been a hard-working individual, who enjoys his work and always does more than is expected of him. He is devoted to his wife and family and has always been involved in his children's activities. He is committed to his church and community and enjoys helping others. The injuries from this accident have seriously impacted him and his family.

3

Mr. Melancon testified that he was preparing to step out of his truck with packages in his hand to deliver to T & J Ford when Mr. Ardoin backed into his truck. He fell forward, out of his truck; he broke his fall by placing his right hand on the sidewalk adjacent to his truck. He landed with his feet in his truck and his upper torso on the sidewalk. Initially, he did not believe he was injured, and he completed his work that day. Two days later, he went to Dr. Eric Chatman, an internist, who diagnosed a ruptured disc at L5-S1 on the right side. Dr. Chatman referred Mr. Melancon to Dr. John Cobb, an orthopedic surgeon. Dr. Chatman continues to assist in Mr. Melancon's medical management. He testified that Mr. Melancon needs continuing medical treatment and that, in his opinion, Mr. Melancon is permanently and totally disabled.

Dr. Cobb performed a laminectomy/discectomy at L5-S1 on the right with a decompression of the L5 nerve on the right on September 12, 2002. He has recommended a fusion at L5-S1 to stabilize movement in Mr. Melancon's back which resulted from the laminectomy. During his trial deposition, Dr. Cobb recommended that a dorsal column stimulator might alleviate some of Mr. Melancon's pain.

After the surgery, Mr. Melancon continued to suffer radicular pain down his right leg. Dr. Cobb referred him to Dr. Daniel Hodges, a physical medicine and rehabilitation physician, for management of Mr. Melancon's continuing pain. An EMG/Nerve Conduction Study revealed damage to the L5-S1 nerve on the right, explaining Mr. Melancon's continued neuropathic pain in his right leg. Dr. Hodges testified that even with a fusion, Mr. Melancon would have some degree of low grade, neuropathic pain down his right leg.

4

On direct examination, Dr. Hodges testified that he considered Mr. Melancon permanently disabled. However, he testified on cross-examination that a fusion, as recommended by Dr. Cobb, could possibly help Mr. Melancon by stabilizing his back and his pain. He explained that, if Mr. Melancon is able to achieve a consistent pain level at three or four with surgery, instead of the undulating pain he now suffers, he could look at light-duty employment. Dr. Hodges also testified that a dorsal column stimulator might relieve some of Mr. Melancon's neuropathic pain. He related that, in his experience, 60-80% of his patients have moderate relief with a dorsal column stimulator and that some of those patients can go back to work; some cannot. He further testified that Mr. Melancon would need continuing treatment for his chronic pain.

As a result of his injuries and his inability to return to work, Mr. Melancon began showing signs of depression. Dr. Cobb referred him to Michael Berard, Ph.D., a clinical psychologist. Dr. Berard diagnosed Mr. Melancon with adjustment disorder, anxiety, depression, chronic pain, and erectile dysfunction. He has been distressed about how his wife and youngest son are being affected by changes resulting from his injuries. He worries that he is not providing for them as he should. It caused him great concern that his youngest son was not able to live away from home to attend college. He is frequently agitated and anxious, and he feels guilty when his agitation and aggravation causes him to lash out at his family in anger. Dr. Berard testified that as long as Mr. Melancon's pain is unresolved he will continue to need psychological treatment, at least once a month, and psychiatric drugs.

5

### *Glen Hebert's Testimony*

Defendants objected to testimony by Glen Hebert, Mr. Melancon's vocational rehabilitation counselor, regarding the cost and replacement of a dorsal column stimulator for treatment of Mr. Melancon's continued pain. Mr. Hebert's testimony was predicated on Dr. Cobb's deposition trial testimony. As indicated above, Dr. Cobb did not present the use of a dorsal column stimulator as a potential mode of treatment for Mr. Melancon until his trial deposition, which was taken the Friday before the Tuesday trial in this matter.

The trial court allowed Mr. Hebert to testify over Defendants' objection on this issue. Mr. Hebert opined that the dorsal column stimulator would cost $80,000.00, as opposed to Dr. Cobb's testimony that it would cost $25,000.00, explaining that $25,000.00 was for the stimulator unit only. He identified additional necessary costs associated with the stimulator: electronic leads, $10,000.00; the surgeon's fee for installation, $10,000.00; and the hospital charge for the procedure, $30,000.00. Mr. Hebert was also allowed to testify that the stimulator would have to be replaced every three years, at a cost of $25,000.00 plus $10,000.00 for installation, even though Dr. Cobb gave no testimony regarding replacement.

We agree with the trial court that dorsal column stimulators are within Mr. Hebert's expertise as a vocational rehabilitation expert. Mr. Hebert testified that he had 100 clients who had used a dorsal column stimulator, and therefore, was very familiar with the cost of the stimulators, as well as the need to replace the stimulators over time. This knowledge and familiarity qualified him to testify on the issues of cost and replacement need.

Defendants also complain that Mr. Hebert based his testimony on periodical articles that were not provided to them before trial but were faxed to the trial court during Mr. Hebert's testimony. The trial court allowed Mr. Hebert's testimony regarding the periodical articles, finding that Defendants had sufficient time to present the information to their expert witness in order for him to prepare his trial testimony. Mr. Hebert testified on Tuesday, August 17, 2004; the trial court concluded court for the day following Mr. Hebert's direct testimony in order to allow Defendants' counsel time to consult with his expert and prepare for cross-examination of him in light of the information elicited during direct-examination.

Defendants contend *Williams v. General Motors Corp.,* 93-287 (La.App. 4 Cir. 2/11/94), 639 So.2d 275, *writs denied*, 94-1896, 94-1898 (La. 11/11/94), 644 So.2d 387-88, where the court found error with the trial court's allowance of expert trial testimony which presented a new theory of liability in a products liability case, requires that we find error with the trial court's rulings on Mr. Hebert's testimony.

The new testimony presented in this case is not of the same nature or magnitude as that in *Williams*. A vocational rehabilitation counselor would be expected to be familiar with the costs and necessity of replacement of medical equipment, such as a dorsal column stimulator. Further, while a vocational rehabilitation expert may not be familiar with the specific periodical articles relied on by Mr. Hebert, the topic is one that such an expert would be expected to have knowledge of in order to rebut the information contained therein. Additionally, Defendants had time to present the additional information obtained from Mr. Hebert to their vocational rehabilitation expert, who did not testify until Thursday, August 19, 2004, in time for him to prepare rebuttal testimony on these issues. We

7

find no error with either of the trial court's decisions regarding Mr. Hebert's testimony.

***Medical Expenses and Bills***

Plaintiffs filed a motion *in limine*, seeking to prohibit Defendants from referring to payment of Mr. Melancon's medical expenses by collateral sources during trial, which the trial court granted. Defendants argue this prohibition resulted in an award of inflated *future* medical expenses.

Mr. Melancon's medical expenses were paid by UPS's workers' compensation carrier because Mr. Melancon was injured while in the course and scope of his employment with the company. Plaintiffs point to La.Code Evid. art. 414, which prohibits the admission of evidence of the payment of workers' compensation benefits to a jury in this situation, arguing the trial court properly denied Defendants' motion. Workers' compensation benefits include medical benefits. La.R.S. 23:1201 and 23:1203. Therefore, the trial court did not err in denying Defendants' request to introduce evidence of the actual amount paid for Mr. Melancon's medical expenses.

Defendants also argue the jury's award of medical expenses that were billed but not actually paid is in contravention of *Bozeman v. State*, 03-1016 (La. 7/2/04), 879 So.2d 692. The decision in *Bozeman* is not at odds with La.Code Evid. art. 414. In *Bozeman,* the supreme court held that the collateral source rule was not violated when a plaintiff whose medical expenses had been paid by Medicaid, a free medical service, was not allowed to recover those expenses from the defendant-tortfeasor because she had not paid any consideration for the service. The collateral source rule prohibits the introduction of evidence that a plaintiff benefitted from payment of medical expenses by a source independent of the tortfeasor's assistance or

8

contribution, here Mr. Melancon's workers' compensation carrier. *LeBlanc v. Acadian Ambulance Serv., Inc.*, 99-271 (La.App. 3 Cir. 10/13/99), 746 So.2d 665. Workers' compensation is social legislation through which "employees and employers surrender certain advantages in exchange for others which are more valuable to both parties and society." *Deshotel v. Guichard Operating Co., Inc.*, 03-3511, p. 7 (La. 12/20/04), 916 So.2d 72, 77. The employee waives the right to sue his employer for damages, if he is injured in the course and scope of his employment, in exchange for receiving workers' compensation benefits, and the employer limits his financial liability for such injuries in exchange for paying workers' compensation benefits. Hence, employees like Mr. Melancon have given consideration for the workers' compensation afforded them by law.

The trial court did not err in refusing to allow the introduction of evidence that the medical expenses actually paid were less than the amounts stated on the medical bills introduced into evidence.

### *Future Medical Expenses*

The jury awarded $257,000.00 in future medical expenses. Defendants argue this award was error because: 1) Mr. Melancon testified that he will not undergo back surgery or utilize a dorsal column stimulator as recommended by Dr. Cobb and 2) his healthcare providers, while testifying that he would need additional future medical treatment, did not estimate the cost of the future medical services and medications he would require.

Future medical expenses are a component of special damages and must be proven by a preponderance of the evidence. *Basco v. Liberty Mut. Ins. Co.*, 05-143 (La.App. 3 Cir. 8/17/05), 909 So.2d 660. To recover future medical expenses, the

9

plaintiff must present medical testimony to show that it is more probable than not that future medical treatment is indicated and the probable cost of the treatment. *Id.* Nevertheless, the supreme court has held that an award of future medical expenses can be made where the record establishes the need for future medical treatment and evidence of past medical expenses and other evidence allows the court to determine "a minimum amount that reasonable minds could not disagree will be required." *Stiles v. K Mart Corp.*, 597 So.2d 1012, 1013 (La.1992). Based on the entirety of the evidence, we find no error with the jury's award.

Douglas Womack, Ph.D., the Melancons' economist, calculated Mr. Melancon's future prescription costs and doctor visits alone as $257,216.00. He utilized past prescription costs of $800.00 per month, past doctor visit charges of $150.00 per month, Mr. Melancon's life expectancy, a growth rate, and a discount rate for this calculation. He calculated the expense for a fusion, a dorsal column stimulator, and replacement of a dorsal column stimulator separately. In regard to these latter expenses, we observe that Mr. Melancon did not testify he would never have a fusion or a dorsal column stimulator. Instead, he testified that he would have one of these procedures only as a last resort.

It was within the jury's prerogative to award any amount of future medical expenses substantiated by the evidence. It appears from the award that the jury awarded expenses for future prescriptions and doctor visits; however, it may have been a combination of prescriptions, doctor visits, a fusion, and/or a dorsal stimulator. In any event, the award is substantiated by the evidence.

*General Damages*

Defendants next contend the jury was clearly wrong in awarding $550,000.00 in general damages for a one-level laminectomy, which resulted in associated depression and sexual dysfunction. When reviewing general damage awards, our role is to review the exercise of the discretion by the trier of fact, not to decide what we consider to be an appropriate award. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). If there is no clear abuse of discretion in the jury's awards, the awards must stand. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976).

We find no abuse of discretion in the jury's general damage awards. Defendants understate the extent of Mr. Melancon's injuries. Not only did he have a disc injury at L5-S1 which required a laminectomy, he now has permanent nerve damage, which has resulted in continuing neuropathic pain down his right leg. He also suffers from depression and sexual dysfunction.

Mr. Melancon and Mrs. Melancon testified at length regarding the effect his injuries have had on him and their family. Their testimony was substantiated by his physicians, who expect Mr. Melancon to continue to suffer pain and the associated anxiety and depression. The jury had the opportunity to observe Mr. Melancon as he testified regarding his injuries, his pain and suffering, and how he has been affected by it all and to compare his testimony with the testimony of his physicians, his wife, and his supervisors. The jury also viewed a video prepared by Defendants, intended to impeach Mr. Melancon's claims regarding the extent of his injuries and the effect his injuries have had on him.

Clearly, the jury believed Mr. Melancon's description of his injuries, his continuing pain and limitations, and the physical, emotional, social, and financial impact they have had on him and that he will continue to suffer pain and limitations into the future. We find no abuse in the jury's awards.

***Directed Verdict***

Pursuant to La.Code Civ.P. art. 1810, a party can move for a directed verdict "at the close of the evidence offered by an opponent." At the close of Plaintiffs' case, T & J Ford moved for a directed verdict, which the trial court granted. Defendants argue this was error.

Article 1810 does not establish a standard for the grant of a directed verdict, but these standards have been jurisprudentially established. In *Carter v. Western Kraft Paper Mill*, 94-524, pp. 4-5 (La.App. 3 Cir. 11/2/94), 649 So.2d 541, 544 (citations omitted), this court outlined the applicable rules:

> [A] directed verdict should only be granted when the facts and inferences point so strongly in favor of one party that the court believes reasonable people could not reach a contrary verdict. It is appropriate, not when there is a preponderance of evidence, but only when the evidence overwhelmingly points to one conclusion. The propriety of granting a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims.
>
> Under the foregoing legal principles the question is not whether in our view the plaintiff has proven his case against defendants by a preponderance of the evidence, but rather, whether, upon viewing the evidence submitted, we conclude that reasonable people could not have reached a verdict in favor of the plaintiff against the defendants. . . .
>
> Questions of credibility should not be resolved by a directed verdict. Making credibility evaluations is one of the primary duties of a jury and the trial court may not take this duty from the jury unless the party opposing the directed verdict has failed to produce sufficient evidence upon which reasonable and fair-minded persons could disagree. Evaluations of credibility play no part in reaching a decision on a motion for directed verdict.

To affirm the trial court's grant of directed verdict, we must conclude that reasonable people could not have concluded that T & J Ford had a duty to mark its parking lot, that it failed to do so, and that the failure to do so contributed to the accident.

As noted by T & J Ford, only Plaintiffs sued T & J Ford. Defendants alleged fault on the part of T & J Ford as an affirmative defense, but did not file a claim against it. Plaintiffs did not present any evidence at trial that would establish fault on the part of T & J Ford.

Defendants contend the trial court deprived them of the opportunity to present evidence on this issue to establish third-party fault. Three witnesses testified during the trial regarding T & J Ford's parking lot: Mr. Melancon; Mr. Lamke, a T & J Ford employee; and Mr. Ardoin, who testified during Plaintiffs' case and Defendants' case. Mr. Ardoin's testimony after the directed verdict was granted did not present any facts that had not been addressed during his testimony in Plaintiffs' case. The testimony of these witnesses did not require a credibility determination by the trial court.

Mr. Ardoin testified that he did not see the UPS truck behind him before striking it. He also testified that he looked only in his left rear-view mirror as he backed from his parking space; he did not look in his center rear-view mirror or his right rear-view mirror, nor did he look behind him through the "back glass" of his truck. He acknowledged that he knew trucks regularly parked where Mr. Melancon parked his UPS truck the day of the accident, that nothing blocked his view of the UPS truck, and that he had a habit of not looking behind him through the "back glass" of his truck when backing his vehicle. After the accident, Mr. Ardoin backed out of his parking space, while Mr. Melancon's truck remained in its original location,

13

without incident and left T & J Ford. Mr. Melancon testified that Mr. Ardoin was parked where he could have driven forward, instead of backing up, when leaving T & J Ford.

Pursuant to La.R.S. 32:281(A), a driver must not back his vehicle unless he can do so safely and without interfering with traffic. The driver of a backing vehicle has a high duty of care to determine whether he can back his vehicle safely. *Andrews v. Mosley Well Serv.*, 514 So.2d 491 (La.App. 3 Cir.), *writ denied*, 515 So.2d 807 (La.1987). This principle applies to a determination of negligence when an accident occurs on private premises. *Francis v. Commercial Union Ins. Co.*, 594 So.2d 1025 (La.App. 3 Cir. 1992). There is no evidence that anything other than Mr. Ardoin's inattentiveness caused this accident. We find no error with the trial court's grant of the directed verdict.

Defendants cite the case of *Sullivan v. Gulf States Utilities Co.*, 382 So.2d 184 (La.App. 1 Cir.), *writ denied*, 384 So.2d 447 (La.1980), in support of their argument that T & J Ford had a duty to monitor its parking lot and that its failure to do so contributed to the accident. In *Sullivan*, a number of concrete piers, two feet above ground level and four and a half feet in diameter, were constructed in a parking lot. Plaintiff was injured when he struck one of the piers as he left the parking lot at approximately 10:00 p.m. Barricades had initially been placed in front of the pier in question. However, they had been removed prior to the accident. At the time of the accident, the pier was not marked, painted, or barricaded. The evidence indicated that the pier's grayish color blended almost imperceptibly into the aging asphalt that covered the parking lot. The trial court found the defendants were negligent for failing to place warning devices around the pier.

14

The facts presented in *Sullivan* are not analogous to the facts presented here. Defendants do not contend obstructions in the driving lane of T & J Ford's parking lot caused this accident. They contend that T & J Ford had a duty to regulate and monitor the parking in its parking lot and that the jury was presented with a reasonable factual basis to find T & J Ford negligent and assess it with fault for Mr. Ardoin's backing into Mr. Melancon. Plaintiffs did not present such evidence in their case, and Defendants did not have a witness listed on their witness list qualified to present such evidence.

We have reviewed the record and find no basis for reasonable people to reach a verdict in favor of Plaintiffs against T & J Ford. Accordingly, we find no error with the trial court's grant of a directed verdict in favor of T & J Ford.

### Jury Selection

Defendants contend the trial court committed reversible error when it denied their challenges for cause of three potential jurors. Defendants allege they had to use three of their four peremptory challenges to strike these three potential jurors. However, they only used two of their four peremptory challenges to eliminate two of the three potential jurors because T & J Ford struck the third juror who was also objectionable to Defendants. For this reason, we need not address Defendants' complaints concerning this third potential juror. Defendants exhausted all of their peremptory challenges before jury selection was complete.

Mary Margaret Jolivette was one of the potential jurors Defendants challenged for cause. Ms. Jolivette testified that she knows the Melancons and has for a long time. She described them as "good dear friends" and "friends in the Lord." She also testified that she would be "honest" and judge the case by "looking at the evidence."

15

She had no knowledge of the lawsuit; she knew Mr. Melancon had been injured while working for UPS but nothing else.

Elizabeth Carmouche, the other potential juror challenged for cause and struck by Defendants, testified that she and her husband are close friends with the Melancons and that Mrs. Melancon is her husband's first cousin. Ms. Carmouche also testified that, while she knew Mr. Melancon had been involved in an accident, she did not know anything about the lawsuit until she entered the courtroom for jury selection. She testified that her friendship and familial relationship would not influence her decision in this case, stating "I have to be fair."

"A juror may be challenged for cause . . . [w]hen the relations whether by blood, marriage, employment, friendship, or enmity between the juror and any party . . . are such that it must be reasonably believed that they would influence the juror in coming to a verdict." La.Code Civ.P art. 1765.

> A refusal by a trial judge to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. "[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied."

*State v. Robertson*, 92-2660, p. 4 (La. 1/14/94), 630 So.2d 1278, 1281 (citations omitted); *see also Simms v. Progressive Ins. Co.*, 38,804 (La.App. 2 Cir. 9/29/04), 883 So.2d 473, *writ denied*, 04-2871 (La. 1/28/05), 893 So.2d 78.

The trial court found that Ms. Carmouche and Ms. Jolivette had been rehabilitated because they testified that the evidence in the case would govern their

decisions therein, not their relationships with Plaintiffs. We find no abuse in the trial court's refusal to excuse these jurors.

***Closing Argument Error***

Defendants' last assignment of error is that the trial court improperly allowed Plaintiffs to advise the jury that assigning fault to Mr. Melancon would reduce his recovery. They contend that plaintiffs are not allowed to relate this information to juries and that these comments had a direct effect on the jury's determination that Mr. Melancon was not at fault.

"The trial judge has great discretion in regulating and controlling the opening and closing arguments to a jury within proper bounds. The rulings of the trial court in controlling and regulating the arguments of counsel will not be reversed unless they constitute an abuse of his much discretion." *Guidry v. Boston Old Colony Ins. Co.*, 540 So.2d 543, 546 (La.App. 3 Cir.), *writ denied*, 543 So.2d 7 (La.1989). As noted by Defendants, improper statements by counsel must have influenced the jury and contributed to its verdict to constitute reversible error. *State v. Harris*, 01-2730 (La. 1/19/05), 892 So.2d 1238, *cert. denied*, ____ U.S. ____, 126 S.Ct. 102 (2005).

The trial court instructed the jury on contributory negligence and comparative fault. We believe implicit in these instructions and the verdict form is the fact that the percentage of fault assigned to Defendants determines their obligation to the Melancons and that any fault assigned to the Melancons reduces their recovery. Therefore, we find no error with the trial court's allowance of the comment.

Furthermore, the jury was provided with sufficient evidence to determine that Mr. Ardoin's failure to maintain a proper lookout when he backed from his parking space was the sole cause of this accident. In light of the evidence, we cannot say that

the comment at issue influenced the jury or contributed to its verdict. Therefore, even if the trial court committed error in allowing the statement, it was not reversible error.

***Past Loss of Earnings***

In their first assignment of error, Plaintiffs argue the jury's award of $170,000.00 for past loss of earnings was manifestly erroneous. Damages for past lost wages can be calculated with mathematical certainty from the proof submitted at trial. *Sengsouly v. Allstate Ins. Co.*, 99-22 (La.App. 3 Cir. 6/9/99), 744 So.2d 649, *writ denied*, 99-2526 (La. 11/19/99), 749 So.2d 677. Therefore, the record must provide a factual basis for the award. *Myers v. Broussard*, 96-1634 (La.App. 3 Cir. 5/21/97), 696 So.2d 88.

Dr. Womack calculated Mr. Melancon's past loss of earnings from the date of the accident to trial as $173,623.00, plus fringe benefits in the amount of $57,650.00 for a total of $228,273.00. Dr. Boudreaux calculated his past loss of earnings as $164,403.00, if he could not return to work, and testified that ten to twelve percent should be added to that amount for fringe benefits. Adding ten percent results in a total of $180,843.30 for past loss of earnings, according to Dr. Boudreaux's testimony.

Dr. Boudreaux also testified that Mr. Melancon's past loss of earnings were within a range of $101,000.00 to $122,000.00, if he could have returned to light-duty work making $8.00, $10.00, or $12.00 per hour in November 2003. These calculations were based on Dr. Cobb's testimony that Mr. Melancon could perform light-duty work beginning in October or November of 2003 and on the testimony of John Grimes, Ph.D., Defendants' vocational rehabilitation counselor, regarding jobs Mr. Melancon could perform in that range and wages he could earn at such jobs. As

18

noted by Plaintiffs, Dr. Cobb deferred to Dr. Hodges on the issue of neuropathic pain caused by his injured L5-S1 nerve. However, Dr. Hodges testified that a fusion might stabilize Mr. Melancon's neuropathic pain and allow him to return to work.

Pursuant to Dr. Hodge's testimony, the jury could have determined that, if Mr. Melancon had had a fusion, he could have returned to some form of light-duty work prior to trial. In connection therewith, Dr. Boudreaux's calculations provide a reasonable basis for the jury's award of $170,000.00 for past loss of earnings. Therefore, we find no error with the award.

***Future Loss of Earnings/Loss of Earning Capacity***

Plaintiffs urge that the jury's award of $755,000.00 for future loss of earnings/loss of earning capacity was manifestly erroneous. They contend the award should be $1,510,392.00. Defendants argue the factual, medical, and expert evidence provided a reasonable basis for the jury's award; therefore, it is not clearly wrong and cannot be reversed.

Loss of future wages awards, like general damage awards, are "inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty." *Myers v. Burger King Corp.*, 92-400, 93-1626, p. 14 (La.App. 4 Cir. 5/26/94), 638 So.2d 369, 379. The loss of future earnings need not be proven with mathematical certainty, but only by such proof as reasonably establishes the plaintiff's claim. *Veazey v. State Farm Mut. Auto. Ins.*, 587 So.2d 5 (La.App. 3 Cir.1991). Factors to consider in determining an award for future loss of income include the plaintiff's physical condition before the injury, his work history, work consistency, the amount he probably would have earned absent the injury complained of, and the probability that he would have continued to earn wages for the remainder

of his work life. *LeBlanc v. Steptore*, 98-808 (La.App. 3 Cir. 12/9/98), 723 So.2d 1056, *writ denied*, 99-87 (La. 3/12/99), 739 So.2d 772.

Dr. Womack calculated Mr. Melancon's loss of future earnings as $1,150,854.00. This calculation assumes that Mr. Melancon will never be able to return to work and that he would have worked until age sixty-six, if he had not been injured. Pursuant to UPS's union contract, Dr. Womack calculated Mr. Melancon's future lost fringe benefits as 33% of his future lost wages, or $359,538.00, for a total loss of $1,510,392.00.

Dr. Boudreaux calculated Mr. Melancon's loss of earnings based on a work-life expectancy of 10.29 years, pursuant to Bureau of Labor Statistics. He did not use Mr. Melancon's personal projected retirement age of sixty-six because no studies have followed individuals, like Mr. Melancon, to determine if they actually retire when they intend, rather than the age reflected by Bureau of Labor Statistics.

Dr. Boudreaux presented three sets of calculations for Mr. Melancon's loss of future earnings, all of which assume he will return to work one year following the trial. His calcuations presented a low, medium, and high wage, based on assumptions that Mr. Melancon would return to work earning $8.00 per hour, $10.00 per hour, and $12.00 per hour. Pursuant to Dr. Boudreaux's calculations, Mr. Melancon's lowest loss of future earnings will be $368,000.00 and his greatest loss will be $443,878.00, exclusive of fringe benefits. Dr. Boudreaux testified that, if Mr. Melancon did return to full-time work, there is an 85% chance that he would have group medical insurance coverage and his future lost fringe benefits would be 10% to 12% of his future lost earnings. Dr. Boudreaux agreed with Dr. Womack's calculations of Mr. Melancon's

loss of future earnings and fringe benefits, assuming Mr. Melancon can never return to work and would have worked until sixty-six.

Pointing to Dr. Hodges' and Dr. Chatman's testimony that Mr. Melancon is totally and permanently disabled and cannot return to work, Plaintiffs argue it was error for the jury to award anything less than the $1,510,000.00 Dr. Womack calculated. This argument does not take into account Dr. Cobb's recommendation of a fusion and/or dorsal column stimulator to stabilize Mr. Melancon's back and Dr. Hodge's testimony that a fusion and/or the dorsal column stimulator may stabilize his pain to such an extent that he can return to light-duty employment.

Based on Dr. Cobb's and Dr. Hodge's testimony, Dr. Grimes outlined various positions he believes Mr. Melancon could perform with his existing skills, which would allow him to earn $6.00 to $12.00 per hour. Dr. Grimes testified that the best indicator of whether Mr. Melancon would return to work was his twenty-year work history. He further testified that he strongly believes Mr. Melancon will return to work if released by his physicians.

The jury was presented with differing expert opinions on Mr. Melancon's ability to return to work and his loss of future earnings. Dr. Cobb, Dr. Chatman, and especially, Dr. Hodges discussed Mr. Melancon's current status and the likelihood that a fusion and/or a dorsal column stimulator could stabilize and/or reduce his pain such that he could return to work in the future. The jurors had the opportunity to consider this testimony together with Mr. Melancon's testimony that he likes to work and wants to work and Mrs. Melancon's testimony that he is a workaholic. Based on the evidence, we cannot say that the jury's award of $755,000.00 for loss of future earnings is not supported by the record.

21

### *Loss of Consortium*

In their last assignment of error, Plaintiffs argue the jury's award of $10,000.00 to Mrs. Melancon for the loss of her husband's consortium was abusively low.

> Loss of consortium is more than just a loss of general overall happiness, it also includes love and affection, society and companionship, sexual relations, the right of performance of material services, the right of support, aid, and assistance, and felicity. The trier of fact is given much discretion in awards for loss of consortium and will not be overturned on appeal in the absence of manifest error.

*Bellard v. S. Cent. Bell Tel.* Co., 96-1426, p. 21 (La.App. 3 Cir. 8/27/97), 702 So.2d 695, 707 (citations omitted), *writ denied*, 97-2415 (La. 12/12/97), 704 So.2d 1202.

Mrs. Melancon's trial testimony centered on Mr. Melancon: what he was like before the accident and how the accident has affected him. She also testified about activities they did before the accident that they do not do now and acknowledged that his injuries have affected their sexual intimacy. While we find the award on the low-end of the range for loss of consortium in a case of this nature, we find no manifest error in the jury's award.

### *Disposition*

For the foregoing reasons, the judgment is affirmed. All costs are assessed to Defendants, Robert Ardoin, Evangeline Gas Company, and Lafayette Insurance Company.

**AFFIRMED.**