# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-352

**LESLIE R. ROACH, ET AL.**

**VERSUS**

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY**

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2001-5384
HONORABLE D. KENT SAVOIE, DISTRICT JUDGE

**********

**MARC T. AMY
JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Michael G. Sullivan, Judges.

**AFFIRMED.**

**Thibodeaux, Chief Judge, dissents and assigns written reasons.**

Frank M. Walker, Jr.
Plauche', Smith, & Nieset
Post Office Drawer 1705
Lake Charles, LA   70602
(337) 436-0522
COUNSEL FOR DEFENDANT/APPELLEE:
    State Farm Mutual Automobile Insurance Company

Norman J. Thigpen
2380 Lake Street
Lake Charles, LA   70601
(337) 497-0123
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Leslie R. Roach
    Larry A. Roach, Jr.

**Barry A. Roach**
**Larry A. Roach, Inc.**
**2917 Ryan Street**
**Lake Charles, LA   70601**
**(337) 433-8504**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Leslie R. Roach**
    **Larry A. Roach, Jr.**

**Michael K. Cox**
**Cox, Cox, Filo, Camel and Wilson**
**723 Broad Street**
**Lake Charles, LA   70601**
**(337) 436-6611**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Leslie R. Roach**
    **Larry A. Roach, Jr.**

AMY, Judge.

A passenger in a vehicle claimed that she suffered injury to her neck when the driver attempted to avoid a collision with another vehicle. Suit was filed against the plaintiffs' automobile liability insurer. Following a trial, the jury found that although the driver was negligent, the passenger's injury was not caused by the accident. The plaintiffs appeal this finding as well as the trial court's denial of their directed verdict on liability and causation. For the following reasons, we affirm.

## Factual and Procedural Background

This dispute involves an accident that allegedly occurred on October 21, 2000. According to Larry Roach, Jr., he, his wife, Leslie Roach, and their two children, Linsey and Larry A. Roach, III, were traveling to a football game in Natchitoches, Louisiana. Mr. Roach, the driver of the vehicle, testified that as he was approaching an intersection, he turned around to the rear of the vehicle, where Mrs. Roach was seated, and asked her to get him a drink from the back of the vehicle. He stated that when he returned his attention to the roadway, he did not notice that the traffic signal had turned red. Consequently, he began proceeding through the intersection before noticing that an eighteen-wheeler was entering the intersection as well. Mr. Roach testified that because he did not have ample time to apply his brakes, he "swerved very hard to the left, basically through the corridor into a skid. And [he] was able to avoid the front of the 18-wheeler."

As a result of this evasive maneuver, Mr. Roach stated that his vehicle was in danger of colliding with another vehicle on the other side of the road. He explained what transpired next:

> I had to throw the car to the right. When I did, the car went into a skid and starting rotating turning in a rotation sideways. And then I, you know, I hit the brakes. And we ended up sliding through the intersection and up against, what I would say is about a six-inch straight

curb and then a concrete embankment that went up like this (indicating). So the car slid side -- skidded sideways, tires hit against that curb, jerked very violently, and then kind of bounced up on the curb and stopped up against the embankment.

Mr. Roach testified that "everybody was kind of shaken up. My wife told me that her neck popped and was burning." He explained that because they thought that the injury to Mrs. Roach's neck was just "a strain or sprain type thing[,]" the family decided to continue their trip. Mr. Roach testified that they left the scene before anyone could stop and offer assistance and that he did not feel the need to report the accident.

Mrs. Roach maintained that not only was she in pain for the rest of the day but that she "had neck pain and a headache for about one or two weeks." She testified that because of her nursing background, she became alarmed when:

all of a sudden, the pain from the neck started progressing down to my shoulder and then down into my elbow, right elbow. And it was not getting better with, you know, just trying to take some Advil, taking a warm shower, those things, and it wasn't getting any better.

According to Mrs. Roach's testimony, she contacted her family doctor, Dr. Arthur Primeaux, two to three weeks after the accident occurred. Mrs. Roach testified that she engaged in a telephone conversation with Dr. Primeaux in which she "told him that we had been involved in a little accident, but I was having neck pain radiating down my shoulder into my arm." She explained that Dr. Primeaux ordered a stress test "to rule out a cardiac problem. And then we also discussed doing cervical x-rays to check my neck." Mrs. Roach subsequently met with Dr. Primeaux to discuss the test results and the best course of treatment. According to her testimony, the x-rays and the stress test came back normal, and Dr. Primeaux gave her an order

2

for physical therapy. The record indicates that Mrs. Roach attended physical therapy for approximately three weeks.

Mrs. Roach testified that in December 2000, Dr. Primeaux ordered an MRI on her cervical spine which showed that there were some abnormalities. He, therefore, referred her to Dr. Alan Sconzert, a neurologist, whom she first visited on May 24, 2001. According to a report for that visit, Dr. Sconzert examined the December 2000 MRI and opined that she had herniated discs at the C4-C5, C5-C6, and C6-C7 levels. Nerve conduction studies and an EMG were performed on May 29, 2001. According to the record, Dr. Sconzert found that there was "evidence of a moderate left carpal tunnel syndrome and mild chronic right C5-C6 radiculopathy." He recommended that Mrs. Roach meet with a neurosurgeon in regard to the cervical radiculopathy.

The record shows that Mrs. Roach first met with Dr. John Raggio, a neurosurgeon, on August 10, 2001. Dr. Raggio testified that during that initial visit, Mrs. Roach complained of "intermittent pain in her neck radiating to the right shoulder and elbow with weakness of the grip in that right hand, after her neck was popped while she was riding in a passenger car." He further testified that he "reviewed an MRI scan that showed a disc abnormality at C5-6 on the right side with x-ray abnormalities on the regular x-ray showing narrowing and deterioration of the disc at C4-5." According to Dr. Raggio, he informed Mrs. Roach that she was a candidate for surgery, but she stated that her symptoms were not severe enough to warrant that option.

According to her medical records, Mrs. Roach did not seek any medical treatment specifically for her neck for the next four years. When asked why she did not visit any doctors in that time period, Mrs. Roach explained:

3

Well, because, again, through physical therapy they showed me different exercises I could do, home treatments I could do, again, like a warm shower, soaking in the warm tub, applying a warm heating pad, sometimes an ice pack. Also, Dr. Raggio had showed me about the traction. Taking over-the-counter medications like Advil, Tylenol. . . . I had also been . . . prescribed Bextra and Celebrex, of which I work for Drs. Brown, Chua, and Prestia at that time. And with their permission, I got my samples for free which didn't cost me any medicine [sic], so I was able to access that.

Mrs. Roach stated that during this period, she was never completely pain free in that she had what she called "flare ups," where she would experience a lot of pain in her neck that would eventually subside. However, she remarked that around June 2005, she had a flare up that "just wasn't easing up. Everything that I had been trying in the past was not giving me any relief, or not substantial relief. It just increased with time."

Upon seeing Dr. Primeaux in September 2005, Mrs. Roach was once again referred to Dr. Raggio, whom she saw in November 2005. Dr. Raggio reaffirmed his position that surgery was the most viable solution to Mrs. Roach's problems. Mrs. Roach testified that in February 2006, she underwent surgery and that since then, she is "[a] hundred percent better" in that she no longer has pain in her neck, shoulder, or arm.

Mrs. Roach filed suit against State Farm Mutual Automobile Insurance Company, her automobile liability insurer, for the injury she sustained in the October 21, 2000 accident, as well as for her children's loss of consortium claims. A jury trial was held in October 2006. At the close of the evidence, the plaintiffs moved for a directed verdict on liability and causation. The trial court denied the motion. Following deliberation, the jury found that Mr. Roach's actions on October 21, 2000 fell below the applicable standard of care. However, it did not find that Mrs. Roach

4

sustained injury as a result of the accident. The plaintiffs now appeal, designating the following as error:

1. The Trial Court erred in failing to grant the plaintiffs a Directed Verdict on liability and causation.

2. The Jury erred in failing to find Leslie suffered injury in the October 21, 2000 accident.

3. The Jury erred in failing to award damages to the plaintiffs.

## Discussion

*Causation*

The plaintiffs contend that the jury erred in failing to find that the October 21, 2000 accident caused Mrs. Roach's neck injury. They reference Mrs. Roach's medical records and testimony, as well as the testimony of Mr. Roach and her treating physicians.

In *Williams v. State Farm Mutual Automobile Insurance Co*., 36,439, p. 4 (La.App. 2 Cir. 10/23/02), 830 So.2d 379, 382, the court stated that "[w]hether the accident caused the plaintiff's injuries is a factual question which should not be reversed on appeal absent manifest error." "Credibility determinations, including the evaluation and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error." *Id*.

At trial, Mr. Roach testified that before the accident on October 21, 2000, Mrs. Roach never complained of any injury to her neck, nor did she receive any medical treatment for her neck. On the day of the accident, she relayed to him that her neck popped and was burning. Mr. Roach testified that his wife told him that the pain radiated into her shoulder, elbow, and arm. He further testified that she wanted to try

5

conservative treatment because she was concerned of the risks and complications that may arise from having neck surgery. Mr. Roach explained that every couple of months, Mrs. Roach would have a flare up.

Mr. Roach acknowledged that Mrs. Roach was involved in a car accident in July 2001. He stated that she complained that the accident aggravated her neck in that she had "a little stiffness and soreness." Mrs. Roach did not seek any medical treatment or file any claim or lawsuit for her injuries. According to Mr. Roach, in February 2002, his wife was involved in another car accident. "[S]he complained that it made her neck bother her a little bit." Mr. Roach testified that in September 2005, his wife saw Dr. Primeaux because she was experiencing new symptoms that were not going away, and she was becoming concerned. After seeing Dr. Raggio in November 2005, she decided to undergo surgery, which was ultimately performed in February 2006.

At trial, Mrs. Roach testified similarly to her husband insofar as she maintained that she did not have any neck injuries prior to the October 21, 2000 accident that required medical treatment. She insisted that on the day of the accident, she "felt an immediate pop and burning in [her] neck. Very painful." Mrs. Roach explained that despite her pain, the family continued on their trip because she did not want to deprive her children of certain experiences related to the football outing.

According to Mrs. Roach, she had pain in her neck for approximately one or two weeks that "started progressing down to my shoulder and then down into my elbow, my right elbow." She estimated that two to three weeks after the accident, she called and visited Dr. Primeaux and explained the problems she had been having as a result of the accident.

Dr. Primeaux testified that when he spoke on the telephone with Mrs. Roach in November 2000, she informed him that she had been in an accident. He explained that he ordered a stress test based on "the pain she described" and that because she was a diabetic, he "wanted to be sure that there was not any involvement with the heart." The stress test came back normal. Dr. Primeaux testified that when he subsequently saw Mrs. Roach, she complained of neck pain radiating down into her arms and numbness in her hands. He testified that he did not write down in his records that she had been involved in an accident. Rather the record for that visit contained the notation "Has been under stress." Dr. Primeaux explained the omission of the accident from the records stating, "I know that we had talked about the McNeese game at that time, too. I'm unsure why I didn't write it, but I know what we had discussed and I know there was an accident at that time." On cross-examination, Dr. Primeaux testified that if the patient tells him his or her injuries and/or the source of those injuries, he normally writes it down if the chart is there; otherwise he tries to remember.[1]

Dr. Primeaux testified that he gave Mrs. Roach some anti-inflammatory medication, but that it was not effective in alleviating her symptoms. Therefore, he ordered cervical x-rays which were normal, except for mild arthritis and degenerative changes at the C6-7 level. An MRI of Mrs. Roach's cervical spine showed some abnormalities. Therefore, Dr. Primeaux referred her to Dr. Sconzert, who opined that

---

[1] Defense counsel noted that when Mrs. Roach saw Dr. Primeaux after being involved in a car accident in February 2002, his records reflected such accident and resulting injuries. It was also noted that Dr. Primeaux did not send her for a stress test. In response, Dr. Primeaux stated that following the February 2002 accident, she "was not complaining of chest pain or any type thing like that." Defense counsel countered by asking if Mrs. Roach was complaining of chest pain in November of 2000. Dr. Primeaux answered that she had complained of neck, chest, and shoulder discomfort.

Mrs. Roach had three herniated discs and recommended that she follow-up with Dr. Raggio.

According to Dr. Raggio's testimony, after reviewing an MRI performed in December 2000, he opined that "there was primarily a disc abnormality at C5-6." When Dr. Raggio was asked if some of the findings on the MRI were degenerative, he responded affirmatively, explaining that "when you see disc space narrowing, bone spur formation, and loss of water content within the disc, that's signs of deterioration of the disc material, which is a normal process of aging." He further explained that these things can make a person more susceptible to a traumatic injury in that area. Dr. Raggio revealed that because Mrs. Roach was not reporting any pain at the time, he recommended surgery if her symptoms returned or persisted.

Mrs. Roach testified that since the October 21, 2000 accident, she had flare ups "off and on" and "then [she] would get okay." She stated that she utilized physical therapy exercises, home treatments, traction, and medication to alleviate her pain. When asked if any physician had prescribed medication to her during that period, she answered, "I was prescribed it, but I did not need to call for refills or for a prescription because I was able to obtain the samples through my employer." Upon further questioning, she admitted that she was not given a written prescription from any physician; rather, she informed her physicians that she would be able to procure the medicine through her employer.

Mrs. Roach confirmed that she was involved in an accident in July 2001, which aggravated her neck "[v]ery little." Another accident occurred in February 2002, in which her neck was "getting a little aggravated, a little stiff[.]" She testified that in June 2005, she experienced a flare up that "just wasn't easing up." She revisited Dr.

8

Primeaux in September 2005, complaining of "strange tightness in [her] right neck, shoulder and forearm for the last two weeks." He referred her back to Dr. Raggio.

Dr. Raggio stated that when he saw Mrs. Roach in November 2005, she complained of "right sided neck pain radiating to the right shoulder, outside of the arm, tingling of the hand." She informed him that "she's had problems in the past similar to this, but this is worsened since June of '05." Dr. Raggio reviewed a new MRI, which showed that "it looked like it was a little bit worse at C6-7 than what [he] had seen previously." In a report written to Dr. Primeaux dated November 7, 2005, Dr. Raggio opined that Mrs. Roach had "cervical spondylosis with radiculitis." At trial, Dr. Raggio explained that spondylosis is the "degeneration of the spinal discs." According to Dr. Raggio, Mrs. Roach agreed to his recommendation of surgery; surgery was performed on February 23, 2006.

With regard to the source of Mrs. Roach's neck injury, Dr. Raggio testified that he did not know whether she received any injury from this accident. However, he explained that based on the history given to him by Mrs. Roach, it was his opinion that the car accident on October 21, 2000 caused her injury and subsequent symptoms. Nevertheless, after examining the December 2000 MRI, he was certain that the bone spurs and the loss of water in her discs were incapable of being caused by an accident that happened six weeks earlier.

Dr. Raggio indicated that he did not know that Mrs. Roach was involved in two subsequent car accidents in which she claimed that she aggravated her neck injury. In fact, he deemed it quite odd that she did not disclose her July 2001 accident because it occurred only a few weeks before her first appointment with him. He

9

stated that she would have been more susceptible to re-injury as a result of this accident and that all of the accidents, combined, could cause wear and tear.

Based on the foregoing evidence, we find that there is a reasonable basis for the jury to have found that the plaintiffs failed to prove that the October 2000 accident caused Mrs. Roach's injury. Although Mrs. Roach claimed that she immediately was in pain following the accident, she and her family continued on their trip, and Mrs. Roach waited approximately two weeks before she sought treatment with Dr. Primeaux. Although both Dr. Primeaux and Mrs. Roach maintained that she told him of the accident, there is no such notation in his records. To the contrary, there is a notation that states that she "has been under stress." Dr. Primeaux asserted that he ordered a stress test because Mrs. Roach had chest complaints and because of her diabetic condition. However, neither the record nor Mrs. Roach's testimony indicated such complaints. Dr. Sconzert opined that Mrs. Roach had three herniated discs whereas Dr. Raggio opined that there was a disc abnormality at the C5-6 level. Of importance is the fact that Dr. Raggio discovered problems with her discs that he concluded were degenerative in nature and could not possibly be caused by a recent car accident.

The jury heard testimony that although Mrs. Roach periodically saw Dr. Primeaux for various ailments in the years following her accident, she did not specifically seek medical treatment for her neck for four years. Mrs. Roach's explanation was that she was utilizing conservative treatment and that, although she was prescribed medication, she was able to obtain free samples of medication from her employer. Mrs. Roach admitted that no physician had prescribed her medication for her neck injury. There was also testimony that Mrs. Roach had two subsequent

10

car accidents, which she claimed mildly aggravated her neck; yet, she failed to share this information with Dr. Raggio, even though the first subsequent accident occurred only weeks before her first appointment with him.

Given the circumstances, we find that the jury's determination regarding causation was not manifestly erroneous. Our resolution of this assignment of error pretermits discussion on the awarding of damages.

This assignment is without merit.

*Directed Verdict*

The plaintiffs argue that the trial court erred in denying their motion for directed verdict on liability and causation. Specifically, they assert in brief that Mr. Roach "admitted in his testimony that the accident was completely his fault and no one else contributed to it (judicially confessing his negligence and liability). He further admitted that his fault and negligence was the cause of [Mrs. Roach's] injuries (judicially confessing his fault and negligence was the cause of [Mrs. Roach's] injuries)." According to the plaintiffs, they "presented witness testimony, expert testimony and exhibits, which presented facts so overwhelmingly in favor of the plaintiffs that reasonable men could not arrive at a contrary verdict."

Louisiana Code of Civil Procedure Article 1810 provides:

> A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

11

In determining whether to grant a directed verdict, this court stated in *Melancon v. Lafayette Insurance Co.*, 05-762, p. 12 (La.App. 3 Cir. 3/29/06), 926 So.2d 693, 704, *writs denied*, 06-974, 06-1006 (La. 6/16/06), 929 So.2d 1291, 1293:

> Article 1810 does not establish a standard for the grant of a directed verdict, but these standards have been jurisprudentially established. In *Carter v. Western Kraft Paper Mill*, 94-524, pp. 4-5 (La.App. 3 Cir. 11/2/94), 649 So.2d 541, 544 (citations omitted), this court outlined the applicable rules:
>
> > [A] directed verdict should only be granted when the facts and inferences point so strongly in favor of one party that the court believes reasonable people could not reach a contrary verdict. It is appropriate, not when there is a preponderance of evidence, but only when the evidence overwhelmingly points to one conclusion. The propriety of granting a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims.
> >
> > Under the foregoing legal principles the question is not whether in our view the plaintiff has proven his case against defendants by a preponderance of the evidence, but rather, whether, upon viewing the evidence submitted, we conclude that reasonable people could not have reached a verdict in favor of the plaintiff against the defendants. . . .
> >
> > Questions of credibility should not be resolved by a directed verdict. Making credibility evaluations is one of the primary duties of a jury and the trial court may not take this duty from the jury unless the party opposing the directed verdict has failed to produce sufficient evidence upon which reasonable and fair-minded persons could disagree. Evaluations of credibility play no part in reaching a decision on a motion for directed verdict.

In denying the plaintiffs' motion for directed verdict, the trial court explained:

[W]hen a motion is filed, the trial court may not take the duty of making credibility evaluations from the Jury unless a party opposing a directed verdict has failed to produce sufficient evidence under which reasonable and fair minded persons could agree.

And that's the situation I feel like I'm in here. There are some credibility issues and I don't feel comfortable taking that away from the Jury's deliberations. So your Motion for Directed Verdict is denied on both issues.

12

At the outset, we note that "a judicial confession is a *party's* explicit admission of an adverse factual element and that it has the effect of waiving evidence as to the subject of the admission, of withdrawing the subject matter of the confession from issue." *Abshire v. Belmont Homes, Inc.*, 04-1200, p. 3 (La.App. 3 Cir. 3/2/05), 896 So.2d 277, 280, *writ denied*, 05-862 (La. 6/3/05), 903 So.2d 458 (quoting *Cheatham v. City of New Orleans*, 378 So.2d 369, 375 (La.1979) (emphasis added). Here, Mr. Roach is neither a named plaintiff or defendant in this matter. Furthermore, any admission on his part is not adverse to his interests insofar as the plaintiffs (his family) would receive damages if the jury rendered a verdict in their favor.

We find that at the close of the plaintiffs' case,[2] there were credibility determinations to be made regarding causation. Therefore, we conclude that the trial court did not err in denying the directed verdict insofar as reasonable minds could disagree on this issue. With regard to liability, we note that no witness, besides Mr. Roach, testified as to how the accident happened. However, the question of whether Mr. Roach was *entirely* responsible for the accident was a credibility determination which was within the province of the jury to decide. Mr. Roach testified that the accident was not reported and that the family left the scene before anyone could offer assistance. After reviewing the record, we conclude that the trial court's denial of the motion for directed verdict on liability was not in error.

Accordingly, this assignment has no merit.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of these proceedings are assessed against the plaintiffs, Leslie R. Roach, et al.

**AFFIRMED.**

---

[2] We note that the defendant did not call any witnesses. It did, however, introduce some of Mrs. Roach's medical records into evidence.

LESLIE R. ROACH, ET AL.

VERSUS

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

THIBODEAUX, Chief Judge, dissenting.

An appellate court must give proper deference to the factual findings and credibility determinations of a trial court. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). That principle is so well-entrenched that a citation is hardly required. That principle, however, need not be adhered to if documents or objective evidence so greatly preponderate that manifest error may exists. *Butler v. Zapata Haynie*, 92-71 (La.App. 3 Cir. 2/23/94), 633 So.2d 1274. A reading of the record in its entirety convinces me that the jury was manifestly erroneous in failing to find the existence of an injury.

Mrs. Roach was examined by Dr. Raggio in August 2001 with complaints of neck pain and numbness and tingling in the hand. Dr. Raggio reviewed a December 2000 MRI performed by Dr. Sconzert, a neurologist. The MRI showed a disc abnormality at the C5-6 level on the right side and the narrowing and deterioration of the disc at C4-5. This MRI was administered *before* the July 2001 accident. According to Dr. Raggio, the MRI findings of December 2000 were consistent with what he visually observed during surgery, i.e., a disc abnormality at C5-6. Dr. Raggio's Medical Provider Lien noted that the injuries for which Mrs. Roach was being treated were injuries that occurred in October 2000. Granted, Dr.

Raggio's testimony was somewhat equivocal. For instance, he testified that, other than the history given by Mrs. Roach, he could not formulate an opinion on an injury occurring in October 2000. Further, during cross-examination, he could not say whether the MRI findings were caused by the October 21, 2000 accident. However, on re-direct examination, the following was elicited:

> Q. The October 2000 accident, if the patient in this case reports a continuous unbroken chain of problems from the October 2000 accident all the way through to the 2006 surgery and you accept that as true, then you would maintain your opinion that the accident caused these problems and the need for surgery, correct?

> A. I think it is part of the causation, yes. I mean, I think if there are other things that occurred of a traumatic nature, they were probably contributory.

State Farm chose not to call any witnesses. Thus, Mrs. Roach's testimony went unchallenged. Dr. Raggio, in part, relied on her history and the objective evidence to formulate an opinion on causation. Where there is no sound reason for the rejection of testimony, an appellate court is not required to affirm "the trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objectively-corroborated testimony . . . ." *Mart v. Hill*, 505 So.2d 1120, 1127.

For the foregoing reasons, I respectfully dissent. I would find the existence of an injury and award appropriate damages consistent with the medical evidence.

2