692 So.2d 1186 (1997)
Judy Gayle BRIDGES, Plaintiff-Appellee,
v.
Alan Douglas BRIDGES, Defendant-Appellant.
No. 96-1191.
Court of Appeal of Louisiana, Third Circuit.
March 12, 1997.
*1187 James Berry Reichman, Bonita K. Preuett, Alexandria, for Judy Gayle Bridges.
Lauren Gay Coleman, Alexandria, for Alan Douglas Bridges.
Before DOUCET, C.J., and WOODARD and GREMILLION, JJ.
WOODARD, Judge.
Defendant appeals the judgment of the trial court in a suit arising out of the partition of the parties' community property pursuant to the plaintiff's filing for divorce.

FACTS
Judy Gayle Bridges and Alan Douglas Bridges were married on February 28, 1970. On March 18, 1993, Mrs. Bridges filed a petition for divorce which was granted on October 11, 1993. The Judgment of Divorce terminated the community acquets and gains, retroactively to March 18, 1993.
On August 25, 1994, along with a Detailed Descriptive List, Mr. Bridges filed a Petition to Partition Community Property. On September 14, 1994, Mrs. Bridges filed an answer to the petition and included her own Detailed Descriptive List. While the parties were able to stipulate concerning the division of most of the community property, certain items remained in dispute, including: the valuation of the homes located at 67 Little John Lane in Dry Prong, Louisiana [hereinafter "Little John residence"], where Mrs. Bridges resides, and 120 Rustic Manor Cove, in Pineville, Louisiana [hereinafter "Rustic *1188 Manor residence"], where Mr. Bridges resides; a Ford Aerostar van; a Dodge vehicle; a utility trailer; and fishing rods and guns. Also in dispute were reimbursements claimed by Mr. Bridges for mortgage payments made on the Pineville property and for payments made on an Isuzu pickup truck. In addition, Mrs. Bridges claimed reimbursements for mortgage payments made on both properties as well as $900 in payments to Dr. Bankston, an orthodontist, for their daughter's braces. Lastly, Mrs. Bridges claimed that the community owed $72,000 to her parents, Mr. and Mrs. Osborne Miller. On April 25, 1995, a hearing was conducted to resolve these disputes.
On August 9, 1995, the trial court issued an opinion, finding that Mr. and Mrs. Bridges were each responsible for one-half of the $72,000 debt owed to the Millers. On January 29, 1996, a partial judgment was signed which incorporated the stipulations of the parties and the conclusions of the trial court, finding that: Mrs. Bridges was to receive the entire $2,200 in proceeds from the sale of the Aerostar Van; the value of the Little John residence was $65,000; and the value of the Rustic Manor residence was $60,000. On May 15, 1996, a judgment was signed which specifically awarded assets and liabilities to each party. It is from that judgment that the Mr. Bridges appeals.

ASSIGNMENTS OF ERROR
The defendant-appellant claims the following assignments of error:
I. The trial court erred in concluding that the $72,000 received by the Bridges from the Millers was a viable debt to be repaid by the parties.
II. The Trial Court erred in accepting the appraisals of Earl Waltman as the correct values of the immovable property.
III. The Trial Court erred in failing to award Doug Bridges one-half (½) of the value of the Aerostar van.

LAW

MANIFEST ERROR
It is well settled that an appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless they are clearly wrong. Stobart v. State, through DOTD, 617 So.2d 880 (La.1993). Based on this standard, the Louisiana Supreme Court has established a two-tier test for reversal on appellate review:
(1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
(2) The appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Id. at 882. Even when an appellate court may feel that its own evaluations are more reasonable than the fact finder's, reasonable determinations and inferences of fact should not be disturbed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). These principles are based upon the trial court's opportunity to evaluate live witnesses and upon the separate and distinct functions of the trial and appellate courts. Stobart, 617 So.2d 880.
Thus, an appellate court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must review the record in its entirety to determine whether the decision reached was manifestly erroneous. Mart v. Hill, 505 So.2d 1120 (La.1987). Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Law v. City of Eunice, 94-1312 (La.App. 3 Cir. 4/5/95); 653 So.2d 149.
Although the trial court is in a better position to evaluate and assess the credibility of witnesses, the overriding concern of the court of appeal is whether the fact finder's credibility determinations are reasonable. "Where documents or objective evidence so contradict the witness' story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness' story, a court of appeal may well find manifest error or clear wrongness over in a finding purportedly *1189 based upon a credibility determination." Rosell, 549 So.2d at 844-45.

ASSIGNMENT OF ERROR NUMBER 1
In his first assignment of error, Mr. Bridges contends that the trial court erred in concluding that the $72,000 received by the Bridges from the Millers during the existence of the community property regime was a viable debt to be repaid by the Bridges.
The undisputed facts indicate that, during the existence of the community, the Millers had:
 Issued a check in the amount of $12,000, payable to "Judy Bridges," on June 8, 1978;
 issued a check in the amount of $10,000, payable to "Judy Bridges," on March 1, 1984;
 issued a check in the amount of $10,000, payable to "Judy Bridges," on July 11, 1984;
 issued a check in the amount of $40,000, payable to "Judy Bridges," on June 4, 1985.
In addition, a promissory note payable "on demand" was executed by the Bridges in favor of the Millers on June 6, 1985 for the final check in the amount of $40,000. No promissory notes for the earlier amounts had been executed by the parties.
The record clearly shows, and there is no dispute, that the first $12,000 was used toward the purchase of the Rustic Manor home, and the two $10,000 checks and the $40,000 check were deposited directly into the Bridges' joint checking account and were used to finance the purchase of the Little John residence. In addition, there is no dispute that the entire $72,000 was used for the benefit of the community.
WAS THE $72,000 A LOAN OR A GIFT?
In this assignment of error, Mr. Bridges contends that the trial court erred when it determined that the $72,000 constituted a loan from the Millers to the Bridges. At the hearing conducted to determine the partition of the disputed items, Judy and Alan Bridges and Mrs. Miller, Judy's mother, testified regarding the nature of the checks issued to them by the Millers. In her testimony, Mrs. Bridges indicated that the entire $72,000 constituted a series of loans, made to them by her parents, payable upon the selling of their Rustic Manor home. However, the home was never sold, but was instead rented. The rental proceeds were kept by the Bridges and never paid to the Millers. Additionally, Mr. and Mrs. Bridges testified that they never made any payments to the Millers on the $72,000 sum to date, nor did the Millers make any demands for repayment. Furthermore, there were no repayment schedules, and Mrs. Miller also stated that the parties never discussed specific repayment terms, and, except for the initial $12,000, the repayment of the money was conditioned on the sale of the Rustic Manor home to the extent it would cover the amounts owed.
La.Civ.Code art. 1846 states:
When a writing is not required by law, a contract not reduced to writing, for a price or, in the absence of a price, for a value not in excess of five hundred dollars may be proved by competent evidence.
If the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances.

(Emphasis added). The total amount of the money received by the Bridges from the Millers well exceeded $500. Therefore, in order to prove that an agreement to repay the money upon the sale of the Rustic Manor property existed, the agreement must be proved by one witness and corroborating circumstances. While Mrs. Bridges and Mrs. Miller properly satisfy the "witness" requirement portion of the statute, there is no other corroborating evidence to prove the existence of the aforementioned agreement. First, conflicting testimony was given regarding the repayment. Mrs. Bridges testified that the money was to be paid when and if they were able. Later, Mrs. Bridges testified that the money was to be paid back from the proceeds of the sale of the Rustic Manor house. Likewise, Mrs. Miller testified that the sums, except for the initial $12,000, were to be repaid from the proceeds of the sale if they were sufficient to cover the amounts. However, there was no indication as to how the *1190 remainder of any outstanding amount, if any existed, was to be repaid, and there is nothing to indicate what "able" means and who is to make that determination. Second, no collateral mortgages or other documents to enforce such an "agreement" were executed. More importantly, the only promissory note in existence, for $40,000, indicated that the note was to be repaid "on demand," and not on the sale of the Rustic Manor home. Therefore, without more, there is insufficient evidence to establish the existence of an agreement to repay the "loans" with the proceeds of the sale of the Rustic Manor home, as is required by statute.
Furthermore, after a careful reading of the record, this court cannot find a reasonable factual basis to support the trial court's determination that the entire $72,000 was a loan. In order to facilitate our analysis of this issue, we must separate the $40,000 check, for which a promissory note was issued, from the remaining $32,000, for which no promissory note was issued.
In the memo portion of the $40,000 check the Millers issued to Mrs. Bridges on June 4, 1985, the word "loan" was written. Additionally, two days after the check was drafted, a promissory note in the amount of $40,000 was executed.
To be classified as a negotiable promissory note, the entire writing must be examined in order to determine whether the requisite formalities have been fulfilled. La.R.S. 10:3-104; Dixie Web Graphic Corp. v. Sharp, 619 So.2d 1173 (La.App. 1 Cir.1993). In Smith v. McKeller, 93-1944 (La.App. 1 Cir. 6/24/94); 638 So.2d 1192, the court examined a note executed prior to the 1994 amendments to La.R.S.10:3-104, as was the note in the case sub judice.
At the time the document was executed, the requirements of La.R.S. 10:3-104 had to be satisfied for it to be classified as a negotiable promissory note. A document had to: "(1) be signed by the maker or drawer; (2) contain an unconditional promise or order to pay a sum certain in money; (3) be payable on demand or at a definite time; and, (4) be payable to order [or] bearer."
At the time the document was executed, La.R.S. 10:3-102(1)(c) provided that "[a] `promise' is an undertaking to pay and must be more than an acknowledgement of an obligation." However, Louisiana jurisprudence provides that the word "promise" does not have to be used ritualistically to confect a promissory note. Instead, the words "to be paid on demand" are sufficient to confect a promissory note.
Id. at 1195 (citations and footnotes omitted).
The promissory note in the present case states: "[I], we, or either of us, promise to pay to the order of Osborne R. Miller, Sr. the sum of Forty Thousand dollars for value received with ... interest ... until paid ... on demand." The writing is followed by the signatures of Judy Bridges and Alan Bridges. The document indicates that it was sworn to and was subscribed before a notary, Mrs. Thelma Miller, on June 6, 1985. However, both Mr. and Mrs. Bridges testified that he was not present when the note was notarized, nor did he sign the note in the presence of the notary. In fact, Mr. Bridges does not recall signing the note at all. Notwithstanding, from all indications on the note, it is properly classified as a negotiable promissory note and evidences the intent of Mr. and Mrs. Bridges to pay Mr. Miller a sum of $40,000. Accordingly, the trial court's determination that the $40,000 constituted a loan is reasonably supported by the facts and is not manifestly erroneous.
However, the remaining $32,000 presented a different question. Initially, this court notes that the three checks totaling $12,000, $10,000 and $10,000, respectively, are distinguishable on their face from the check for $40,000 in three significant ways. First, there is no notation in the memo portion of the checks indicating that they were "loans." Second, no promissory notes were executed for these amounts. Third, no collateral was put up to secure the loans. In order to determine the classification of the $32,000, we must also look to the pre-1994 amendments to La.R.S. 10:3-201 et. seq., as the transactions in question took place prior to 1994. In Succession of Walker, 533 So.2d 70, 73-74 (La.App. 3 Cir.1988), writ denied, 536 So.2d 1254 (La.1989), this court stated:

*1191 Under Louisiana law, property may be gratuitously disposed of in only two ways: (1) Donations inter vivos (between living persons), or (2) Donations mortis causa (in prospect of death). La.C.C. art.1467....
A donation inter vivos is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it. La.C.C. art. 1468. In order to be a valid donation inter vivos of immovable property or of incorporeal things, the donation must be by notarial act. La.C.C. art. 1536, 1538. The only exception to the form requirement of arts. 1536 is the giving of a manual gift. A manual gift, as defined by La.C.C. art. 1539, is "the giving of corporeal movable effects, accompanied by a real delivery." This type of donation is not subject to any formality.
....
Cash is a corporeal movable subject to manual gift. A check which has not been "reduced to possession" by being cashed... is still an incorporeal movable which is not subject to manual gift.
....
However, in 1982, ... the legislature enacted La.R.S. 10:3-201(4), which states:
Donations inter vivos of negotiable instruments shall be governed by the provisions of this Chapter, notwithstanding any other provision of the Louisiana Civil Code or of any other law of this state relative to the form of donations inter vivos, to the contrary.
(Citations omitted). Therefore, we must determine whether the three checks totaling $32,000 were valid negotiable instruments, such that the provisions of Title 10 would apply rather than the form requirements of the Louisiana Civil Code.
In determining whether the checks constituted negotiable instruments, we must look to former La.R.S.10:3-104 and conduct the same analysis as we did to determine whether the promissory note was valid. In so doing, we find that the checks: (1) were signed by the maker or drawer; (2) contained an unconditional promise to pay specific amounts in money; (3) were payable on demand; and (4) were payable to order. Therefore, the three checks constituted valid negotiable instruments subject to the provision of Title 10 of the Louisiana Revised Statutes. Accordingly, without any evidence to the contrary, the three checks constituted valid inter vivos donations, or "gifts," and, as such, are subject to neither formalities, nor repayment. Consequently, while we find that the trial court was correct in holding that the $40,000 check constituted a loan, there is no reasonable factual basis in the record to support the trial court's finding that the three checks in question, collectively totaling $32,000, were loans made by the Millers to the Bridges.
Finally, in reviewing the trial court's opinion rendered on August 9, 1995, it is clear that the trial judge included an additional amount of $5,000 when determining the amount of money that was owed by Mr. and Mrs. Bridges to the Millers and ordered Mr. Bridges to pay half the amount. However, even less evidence was presented to show that the $5,000 constituted a loan than the $32,000 discussed above. For example, no canceled check was presented in evidence, no written documentation as to the amount was recorded, no promissory note was executed, and no collateral was provided to secure the loan. Apparently, in February 1987, the Bridges purchased a Ford Aerostar van. Both Mr. and Mrs. Bridges and Mrs. Miller indicated that the Millers had given the Bridges $5,000 toward the purchase of the vehicle. Mrs. Miller further testified that no repayment arrangements were made, and she never received any money from the Bridges towards repayment. Therefore, as with the $32,000 discussed above, there is no reasonable factual basis to support a finding that the $5,000 constituted a loan. Accordingly, the trial court committed manifest error in finding that the $5,000 constituted a loan from the Millers to the the Bridges.
PRESCRIPTION
In his reasons for judgment, the trial judge properly concluded that the checks and the promissory note at issue in the case sub judice, had prescribed. La.Civ.Code art. 3498 states:

*1192 Actions on instruments, whether negotiable or not, and on promissory notes, whether negotiable or not, are subject to a liberative prescription of five years. This prescription commences to run from the day payment is exigible.
Liberative prescription is a method of barring action on a debt because of inaction for a period of time. Settoon Marine, Inc. v. Great Lakes Dredge & Dock Co., 95-0046 (La.App. 4 Cir. 6/7/95); 657 So.2d 537. Pursuant to La.R.S. 10:3-104, the checks and promissory note are considered to be negotiable instruments as discussed above. In addition, because the promissory note was due on demand, prescription as to the note commenced running on the date the note was executed. Smith, 638 So.2d 1192. The four checks were dated June 8, 1978; March 1, 1984; July 11, 1984; and June 4, 1985, respectively. Therefore, prescription accrued on June 8, 1983; March 1, 1989; July 11, 1989; and June 4, 1990, respectively. Likewise, the promissory note, which was executed on June 6, 1985, prescribed on June 4, 1990. Because we have already determined that the checks totalling $32,000.00 were a gift, and not subject to repayment, we need only address the issue of prescription as it relates to the promissory note of $40,000.00.
In Flowers v. U.S. Fidelity & Guaranty Co., 381 So.2d 378, 383 (La.1979), the supreme court stated, "legal prescription is personal, and generally benefits only the person with whom it originates or whose right has been acknowledged." Furthermore, comment (c) to La.Civ.Code art. 2336 indicates that the community regime is not a legal entity but a patrimonial mass, that is, a universality of assets and liabilities. Therefore, prescription cannot accrue in favor of the community. Prescription can only accrue in favor of the individual members forming the community regime.
NATURAL OBLIGATIONS
Once the promissory note had prescribed, the old debt was extinguished, and only a natural obligation remained on the part of the debtors. Id. A natural obligation "arises from circumstances in which the law implies a particular moral duty to render a performance." La.Civ.Code art. 1760; Gray v. McCormick, 94-1282 (La.App. 3 Cir. 10/18/95); 663 So.2d 480. A moral duty is generally defined as a duty of conscience. Thomas v. Bryant, 25,855 (La.App. 2 Cir. 6/22/94); 639 So.2d 378 (citing Litvinoff, The Law of Obligations, § 2.2, 5 Louisiana Civil Law Treatise (1992)). However, as the court noted in Thomas:
Not every moral duty will serve as the basis of a natural obligation. In order for a duty to rise to the level of a natural obligation, the following requirements must be present:
(1) The moral duty must be felt towards a particular person, not all persons in general.
(2) The person involved feels so strongly about the moral duty that he truly feels he owes a debt.
(3) The duty can be fulfilled through rendering a performance whose object is of pecuniary value.
(4) A recognition of the obligation by the obligor must occur, either by performing the obligation or by promising to perform. This recognition brings the natural obligation into existence and makes it a civil obligation.

(5) Fulfillment of the moral duty must not impair the public order.
Litvinoff, The Law of Obligations § 2.4, 5 Louisiana Civil Law Treatise (1992).
The issue of whether a natural obligation arises from a particular situation is raised only after a person has ... promised to perform. Litvinoff, supra, § 2.6. If in ... promising to perform, the person was obeying dictates of his conscience that prompted him to fulfill a strongly felt moral duty, the ... promise is valid and is enforceable by the creditor. The person's belief in the existence of the moral duty is as important as its reality. Id.

Great discretion must be exercised by the courts in determining whether, in a given situation, a moral duty rises to the level of a natural obligation. Id.

Id. at 380.
Furthermore, La.Civ.Code art. 1761 provides:

*1193 A natural obligation is not enforceable by judicial action. Nevertheless, whatever has been freely performed in compliance with a natural obligation may not be reclaimed.
A contract made for the performance of a natural obligation is onerous.
Lastly, La.Civ.Code art. 1762(1) indicates that a natural obligation is created when a civil obligation has been extinguished by prescription. Once the promissory note had prescribed, and assuming for the moment that it constituted a loan, civil or legal duty on the part of the Bridges to repay the Millers no longer existed. Therefore, once prescription had accrued, the old debt was extinguished, and a natural obligation was created in both Judy and Alan Bridges.
As stated by this court in Curry v. Winnfield, 398 So.2d 97, 99 (La.App. 3 Cir.1981) (citations omitted): "A natural obligation is a sufficient consideration for a new contract,... but there must be a new promise to pay the debt to renounce the accrued prescription."
RENUNCIATION OF PRESCRIPTION AND PROMISE TO PAY
On March 12, 1993, six days prior to filing her divorce petition, Mrs. Bridges executed a "Renunciation of Prescription and a Promise to Pay" in favor of the Millers for the four checks and the $5,000 used for the purchase of the van. The trial court concluded that Mrs. Bridges effectively renounced prescription on behalf of the community. For the following reasons, we disagree.
La.Civ.Code art. 3449 states that prescription may be renounced after it has accrued. As the supreme court stated in Lima v. Schmidt, 595 So.2d 624, 631 (La.1992), "renunciation is the technical term designating the abandonment of rights derived from prescription that has accrued." It is well settled in our jurisprudence that in order to renounce prescription, the renunciation must be clear, direct and absolute, and manifested by the words of the party in whose favor prescription has run, Id.; Bordelon's, Inc. v. Littell, 490 So.2d 779 (La.App. 3 Cir.1986); Settoon Marine, Inc., 657 So.2d 537. Further, "renunciation requires a new promise to pay the debt, as `[a] new obligation binding on the debtor is created when a promise to pay is made after prescription had accrued.'" Lima, 595 So.2d at 631. (citing Bordelon's, Inc., 490 So.2d 779); Succession of Aurianne, 219 La. 701, 53 So.2d 901 (1951), ("A promise to pay a debt made after prescription has accrued creates a new obligation binding on the debtor."). Although the old debt is extinguished, the natural obligation that remains supplies the consideration for the new promise. Smith, 638 So.2d 1192. The renunciation does not have the effect of reviving the old obligation, but rather creates a new one. Dolese v. Harvey, 94-1763 (La. App. 4 Cir. 1/19/95); 649 So.2d 100, writ denied, 95-0702 (La.4/28/95); 653 So.2d 597.
The community regime is not a legal entity, but rather a patrimonial mass. As such, it cannot own property or have obligations. Furthermore, jurisprudence has established that the renunciation of prescription must be made clearly and explicitly by the person in whose favor prescription has accrued. "A renunciation of prescription is subject to stringent proof requirements." Id. at 102. (citing Lima, 595 So.2d 624). The "Renunciation of Prescription and Promise to Pay" was executed by Mrs. Bridges and witnessed by her father, Osborne Miller. Mr. Bridges' signature does not appear on the document. Indeed, at the partition hearing, Mrs. Bridges testified that she did not inform Mr. Bridges of her intent to execute such a document and that when she executed the document, she had already intended to file for divorce, evidenced by her filing the petition a mere six days later. Mr. Bridges testified that he was not aware that Mrs. Bridges had signed such a document. Therefore, there is no evidence that Mr. Bridges had any intention of renouncing the prescription that had accrued in his favor or any intention to enter into a new enforceable obligation.
As such, the "Renunciation of Prescription and Promise to Pay" executed by Mrs. Bridges was a new contract based upon her natural obligation. Mrs. Bridges did not have the power to renounce the prescription that accrued in Mr. Bridges' favor, as prescription is personal to the individual, or to *1194 enter him into a new obligation based on his natural obligation, if one, in fact, existed.
IS THE "PROMISE TO PAY" A SEPARATE BLIGATION OR A COMMUNITY OBLIGATION?
The trial court's conclusions, that Mrs. Bridges' renunciation of prescription created a community obligation and had the effect of reviving the old debts, are manifestly erroneous.
In support of its position that Mrs. Bridges had the authority to renounce prescription in favor of Mr. Bridges, the court erroneously states:
Judy Bridges had the authority to renounce prescription on behalf of the community because she was not expressly prohibited from doing so by La. C.C. Art. 2347 which provides:
"The concurrence of both spouses is required for the alienation, encumbrance, or lease of community immovables, furniture or furnishings while located in the family home, all or substantially all of the assets of a community enterprise and movables issued or registered as provided by law in the names of the spouses jointly".
This conclusion is incorrect for several reasons. First, as we have already discussed, prescription accrues in favor of an individual, not the community. As such, Mrs. Bridges could not renounce the prescription that accrued in favor of Mr. Bridges. Second, regarding the renunciation's effect of reviving the old debt, Mrs. Bridges was actually entering into a new obligation, based on her natural obligation.
As such, La.Civ.Code arts. 2359, 2361 and 2363, and not art. 2347, provide guidance. Article 2359 provides that obligations incurred by a spouse during the existence of the legal regime may be classified as either separate obligations or community obligations. Article 2361 states:
Except as provided in Article 2363, all obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations.
Article 2363 states, in pertinent part:
A separate obligation of a spouse is one incurred by that spouse ... during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse.

(Emphasis added.) Comment (b) to art. 2363 is also illustrative:
An obligation incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse is a separate obligation.
There is no evidence to suggest that Mrs. Bridges' promise to pay $77,000 to the Millers was executed for the common interest of the spouses or for the benefit of the community or Mr. Bridges. If the $77,000 indeed constituted "loans," the duty to repay them from the patrimonial mass of the community had long since expired by liberative prescription. As such, neither spouse, as members of the legal regime, was obligated to repay the "loans." Accordingly, the "Renunciation of Prescription and Promise to Pay" executed by Mrs. Bridges was a new obligation which constitutes a separate obligation.
BAD FAITH
An analysis of this assignment of error would not be complete without addressing the apparent bad faith on the part of Mrs. Bridges that was evidenced by the "Renunciation of Prescription and Promise to Pay."
In addition to attempting to renounce prescription on behalf of Mr. Bridges without his knowledge, Mrs. Bridges attempted to encumber community immovables without his consent or knowledge and with the intention of filing a petition for divorce, which she did six days later. Under paragraph 4 of the "Renunciation of Prescription and Promise to Pay," Mrs. Bridges attempted to execute and deliver a collateral mortgage note and a collateral mortgage on the Rustic Manor and Little John properties.
The trial court properly recognized that the concurrence of both spouses is required *1195 for the encumbrance of community immovables. La.Civ.Code art. 2347. Furthermore, La.Civ.Code art. 2353 states, in pertinent part: "When the concurrence of the spouses is required by law, the alienation, encumbrance, or lease of community property by a spouse is relatively null...." Therefore, the trial court was correct in finding that the collateral mortgages as executed in the document were invalid.
A similar scenario arose in Auger v. Auger, 381 So.2d 879 (La.App. 2 Cir.1980). In Auger, there was evidence that the parties had experienced marital difficulties and had physically separated. Prior to the physical separation, the husband transferred properties to his father and brother for which cash consideration was never tendered. Therefore, the trial court concluded that the husband's actions constituted a deliberate attempt to reduce the wife's community interest and granted the wife her share of the transferred properties. The trial court based its conclusions, in part, on the marital difficulties and physical separation which occurred a few days prior to the transfer of the property; the imminent filing of a suit for legal separation; and the vendees in the deeds being the husband's close relatives. As in Auger, the secretiveness of Mrs. Bridges' actions, as well as her attempts to encumber community property for the benefit of her parents, which required her husband's concurrence, leads this court to suspect her intentions.
Based on our foregoing analysis, we find that the trial court was manifestly erroneous in: (1) Concluding that the entirety of the $77,000 given to the Bridges by the Millers constituted loans, and (2) concluding that the "Renunciation of Prescription and Promise to Pay" executed by Mrs. Bridges had the effect of renouncing the prescription that accrued in favor of Mr. Bridges, thereby creating an obligation on behalf of both spouses to repay the $77,000 that was given to them by the Millers. We, therefore, conclude that: (1) The "Renunciation of Prescription and Promise to Pay" executed by Judy Miller had effect only as to her, and, as such, constitutes a separate obligation payable from her separate property, and (2) Mr. Bridges is not liable for any part of the $77,000 obligation incurred by Mrs. Bridges.
ASSIGNMENT OF ERROR NUMBER 2
In his second assignment of error, Mr. Bridges claims that the trial court erred in accepting the appraisals of Earl Waltman as the correct values of the immovable property, namely the Rustic Manor and Little John residences. For the following reasons this assignment of error lacks merit.
At the hearing regarding the partition of the community property, the trial court heard testimony from Waltman, a real estate appraiser who was accepted as an expert in his field. Mr. Waltman testified that he performed real estate appraisals on the Rustic Manor home and the Little John home on June 1, 1993 and concluded that the value of the Rustic Manor property was $60,000 and the value of the Little John property was $65,000.
In their detailed descriptive lists, however, Mr. and Mrs. Bridges disagree as to the value of the properties in question. Mrs. Bridges' list, submitted on September 13, 1994, indicated the values as testified to by Mr. Waltman. Mr. Bridges' descriptive list, submitted on August 25, 1994, indicated that the value of the Rustic Manor home was $58,000 and the value of the Little John residence was $75,000. The hearing took place on April 25, 1995. Therefore, the detailed descriptive lists of both parties were not current as to the value of the properties in question. In reaching a determination as to the value of the properties, it is apparent that the trial court relied on the testimony of Waltman.
Mr. Bridges now complains that the trial court erred in accepting the values as presented by Waltman. The circumstances at issue in the case sub judice are similar to those presented in Roberts v. Roberts, 542 So.2d 517, 519 (La.App. 5 Cir.), writ denied, 547 So.2d 1317 (La.1989). In Roberts, the fifth circuit stated:
In the judgment the trial judge valued the Lookout Place at $73,000 and the L & A Road real estate at $269,600. Mrs. Roberts states these values were erroneous because the law requires the trial judge to *1196 value assets of the community as of the date of trial. LSA-R.S. 9:2801, Pitre v. Pitre, 501 So.2d 344 (La.App. 3 Cir.1987). Since no appraisal was presented of the value on the date of trial, she contends the issue must be remanded for this evidence.
R.S. 9:2801 provides the rules for judicially partitioning the community property when the spouses cannot agree. R.S. 9:2801(4)(a) mandates the trial judge to:
"Value the assets as of the time of trial on the merits, determine the liabilities and adjudicate the claims of the parties."
In paragraph (3) of the article, the court is given discretion to appoint experts as it deems proper, including for the purpose of appraisals.
In this case, neither Mr. Roberts nor Mrs. Roberts nor the trial judge found it necessary to obtain current appraisals, although the opportunity existed for any or all to do so. The trial judge properly chose from the best evidence and Mrs. Roberts cannot now complain of the result. We find no error therefore in the trial judge's valuation of the real estate located on Lookout Place and L & A Road.
Therefore, as in Roberts, the trial court in the present case was not required to have a current appraisal of the real estate for the purposes of partitioning the community property, as of the date of trial, and may rely on its discretion where neither party submitted a current appraisal.
As this court stated in Alford v. Alford, 94-1464 (La.App. 3 Cir. 4/5/95); 653 So.2d 133, 136:
It is well settled that, in valuing assets, the trial court is not required to accept, at face value, the valuation placed on assets by either spouse. If the trial court's valuations are reasonably supported by the record and do not constitute an abuse of discretion, its determinations should be affirmed.
Based on the foregoing, we conclude that the trial court did not abuse its discretion in valuing the property based on the conclusions of the only expert presented at trial. Therefore, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 3
In his third assignment of error, Mr. Bridges contends that the trial court erred in failing to award him one-half of the value of the Aerostar van.
The following facts are undisputed. At the time of the separation, the van was purchased during the existence of the legal regime, constituting community property, and had been paid in full. Mrs. Bridges retained use of it, and continued to use it until it developed transmission problems at which time she parked it at her parents house and left it there. Later, the parties discussed what would be done with it since it was no longer operational. They agreed to sell it. At that time, Mr. Bridges signed the title to the vehicle and gave it to Mrs. Bridges in order to consummate the sale. Subsequently, the van was sold for $2,200. Mr. Bridges never received any proceeds from the sale.
At the time of the separation, Mr. Bridges was granted use of the Isuzu pickup, which was also part of the community. The note on the Isuzu had not yet been paid, and therefore, constituted a community obligation. La.Civ.Code art. 2360. During that time, Mr. Bridges made payments on the Isuzu pick-up.
In its ruling, the trial court concluded that Mrs. Bridges should reimburse Mr. Bridges for one-half of the payments made on the Isuzu's note while in his possession and use, as it constituted a community debt. The court further held that Mrs. Bridges would not, therefore, have to account for the $2,200 received for the van. La.R.S. 9:2801 provides, in pertinent part:
(4) The court shall then partition the community in accordance with the following rules:
....
(b) The court shall divide the community assets and liabilities so that each spouse receives property of an equal net value.
In reaching its determination regarding the Isuzu and the Aerostar van, it appears that the trial court was attempting to partition the community assets and liabilities, *1197 as a whole, to ensure that each spouse received an equal value of the community. Therefore, we cannot say the trial court committed manifest error or abused its discretion. Accordingly, this assignment of error lacks merit.

CONCLUSION
Based on the foregoing analysis, we reverse the trial court inasmuch as it determined that Mr. Bridges was responsible for the sum of $38,277.84; we affirm the trial court's findings regarding the appraisals of the Rustic Manor property and the Little John property; we further affirm the trial court's ruling that Mr. Bridges was not entitled to receive one-half of the proceeds from the sale of the Aerostar van.
AFFIRMED IN PART AND REVERSED IN PART.