# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 17-608


**PAMELIA ELMER VILLA, ET AL.**

**VERSUS**

**GEICO CASUALTY INSURANCE CO., ET AL.**


********** 

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2014-396
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, John E. Conery, D. Kent Savoie, Van H. Kyzar, Judges.

**Conery, J., concurs in part and dissents in part and assigns reasons.**


**REVERSED IN PART; AFFIRMED AS AMENDED.**

**L. Paul Foreman**
**William S. Joyner**
**Raggio, Cappel, Chozen & Berniard**
**1011 Lakeshore Drive, Suite 500**
**Lake Charles, LA 70601**
**(337) 436-9481**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **GEICO General Insurance Company**

**Stephen R. Barry**
**K.E. Libby Heinen**
**Barry & Company, LLC**
**405 West Main Street**
**Lafayette, LA 70501**
**(337) 237-2889**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Marie Matte**

**Russell J. Stutes, Jr.**
**Jody Lavergne**
**Jeanette Dewitt-Kyle**
**Stutes & Lavergne, L.L.C.**
**600 Broad Street**
**Lake Charles, LA 70601**
**(337) 433-0022**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Pamelia Elmer Villa**

**EZELL, Judge.**

Pamela Villa appeals a trial court judgment awarding her damages for injuries she sustained in an automobile accident. On appeal, she claims that the jury's award of damages was inadequate. She also claims that the trial court erred in failing to take corrective action because defense counsel violated a stipulation and argued to the jury that Defendant, Marie Matte, would have to personally pay the judgment.

Defendants, Ms. Matte and GEICO General Insurance Company, also appealed the trial court judgment. Ms. Matte claims the trial court erred in allowing Ms. Villa to assert a lost wage claim and in allowing an optometrist to testify regarding her need for surgery.

GEICO claims that the trial court erred in interpreting La.R.S. 22:1266 to impose a burden of proving delivery of notices of cancellation for nonpayment when proof of mailing is established and the effective date of cancellation is more than ten days after the date of mailing.

## FACTS

On December 10, 2013, Ms. Villa was injured when her vehicle was struck by a vehicle driven by Ms. Matte, who ran a stop sign. She was transferred to Lake Charles Memorial Hospital by ambulance. Upon admission to the emergency room, Ms. Villa was treated by Dr. Thomas Axelrad. According to medical testimony and records, Ms. Villa suffered a head injury, worsening of neck pain, a displaced sternum fracture with three rib fractures, three herniated lumbar discs, a large hematoma on her right hip, a sprain of the left knee, a sprain and cartilage loss in the right knee, an avulsion fracture of her left ankle, and bruising and swelling of the right ankle. Additionally, Ms. Villa claimed that the deployment of

the air bag, which hit her in the face, caused the lens implant in her right eye to shift, necessitating the need for surgery to replace the lens.

Ms. Villa was hospitalized for four days, where she was placed on a Foley catheter and given Morphine for pain. Dr. Axelrad testified that Dilaudid was later prescribed to Ms. Villa because her pain was so intense. Upon her release from the hospital, Ms. Villa slept in a recliner at her house. Ms. Villa was dependent on others to take care of her, her house, and her yard. Three months after the accident, Ms. Villa returned to work at her family's business, Elmer's Radiator Shop.

Ms. Villa filed suit against Ms. Matte and GEICO on February 11, 2014. A trial before a jury on the issue of damages was held on December 5-7, 2016. The jury found that Ms. Villa suffered damages as a result of the accident and awarded damages in the following amounts: 1) $32,500.00 for past and future pain and suffering; 2) $4,000.00 for past and future mental anguish; 3) $1,000.00 for past and future loss of enjoyment of life; 4) $45,740.00 for medical expenses; and 5) $6,480.00 for lost wages.

On December 8, 2016, a bench trial was held on the issue of whether GEICO provided coverage to Ms. Matte for the accident at issue. Following trial on the issue, the trial court ruled that that even though there was sufficient evidence that GEICO mailed notice of cancellation, GEICO failed to provide the requisite ten-day notice as required by the law. Therefore, the policy issued by GEICO provided coverage for this accident.

Judgment in this matter was signed on March 13, 2017. Ms. Villa, Ms. Matte, and GEICO all appealed the judgment.

## IMPROPER CLOSING ARGUMENT

In her first assignment of error, Ms. Villa argues that Ms. Matte's counsel improperly referred to a personal judgment against Ms. Matte and her inability to pay it when the parties stipulated in open court that no one was allowed to suggest to the jury that Ms. Matte would have to personally pay the judgment. Ms. Villa argues that the impact of this argument was prejudicial, which the trial court failed to correct after her counsel objected. Ms. Villa argues that this requires us to review the jury's award using a de novo standard. Ms. Villa cites *Rodriguez v. Taylor*, 468 So.2d 1186 (La.1985), for the proposition that a defendant cannot argue the inability to pay as an excuse to avoid full accountability in a personal injury case.

The trial court has great discretion in regulating and controlling the opening and closing arguments to a jury within proper bounds, and its rulings will not be reversed unless they constitute an abuse of discretion. *Melancon v. Lafayette Ins. Co.*, 05-762 (La.App. 3 Cir. 3/29/06), 926 So.2d 693, *writs denied*, 06-974, 06-1006 (La. 6/16/06), 929 So.2d 1291, 1293. "[I]mproper statements by counsel must have influenced the jury and contributed to its verdict to constitute reversible error." *Id*. at 706.

Prior to trial, the parties discussed some housekeeping matters. Both attorneys agreed that there would be no mention that there was or was not insurance coverage. In closing argument, Ms. Matte's counsel stated: "[W]hat was that number he put up there, $300,000. Because they don't want you to add it all up. When you add it all up, that is an astronomical amount of money to ask Ms. Matte to pay for this." At this point, counsel for Ms. Villa objected.

Although this remark does not specifically refer to Ms. Matte's ability to pay a judgment, it comes very close. It infers that the amount of damage requested is a lot for Ms. Matte to personally pay as opposed to being a large amount of money in damages based on the injuries Ms. Villa received in the accident. We agree with the trial court that this remark was not prejudicial enough at this point to admonish the jury. The trial court did admonish counsel to watch his statements in the future. We find no abuse of discretion in the trial court's failure to admonish the jury.

## EXPERT TESTIMONY

We will next address Ms. Matte's argument on appeal that the trial court erred in allowing Ms. Villa's optometrist to testify regarding her need for cataract revision surgery. The lens transplant surgery was performed by Dr. Charles Thompson, an ophthalmologist. As an optometrist, Dr. Keith Menard is not qualified to perform this surgery. Therefore, Ms. Matte argues Dr. Menard should not have been allowed to testify in lieu of Dr. Thompson regarding Ms. Villa's need for lens replacement surgery as a result of the accident.

In determining whether to allow a witness to testify as an expert, the trial court is afforded wide discretion, and its determination will not be disturbed on appeal unless clearly wrong. *Marshall v. Boydston*, 09-1137 (La.App. 3 Cir. 3/17/10), 33 So.3d 438, *writ denied*, 10-881 (La. 6/25/10), 38 So.3d 339. If "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue", a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify [thereto] in the form of an opinion or otherwise." *Id.,* at 443 (quoting La.Code Evid. art. 702). Generally, the fact that a medical doctor is not a specialist in a medical field does not affect the admissibility of his testimony but only applies to the effect or

the weight be given to such testimony. *Marshall*, 33 So.3d 438; *See also Sattler v. Hammond*, 93-1227 (La.App. 3 Cir. 5/4/94), 640 So.2d 570, *writ denied*, 94-1418 (La. 9/16/94), 642 So.2d 198.

Dr. Menard testified that an optometrist's primary job is to assess the visual and health status of a patient's eye and manage and treat that visual health status in whatever way is deemed necessary, including recommending procedures and giving referrals for consults for the procedures. On cross-examination about his qualifications, the jury heard that while Dr. Menard can make a decision that a patient needs surgery, Dr. Menard agreed that he is not allowed to perform the type of surgery Ms. Villa required.

After qualifying as an expert optometrist, Dr. Menard explained to the jury that he first started treating Ms. Villa in April 2011. Her history indicated that she had a cataract exchange intraocular lens implant in her right eye in 2009. The lens implant did not attach well and stay centered. As a result, she developed some chronic inflammation. Dr. Menard testified that he had control of the situation with eye drops so that Ms. Villa had little-to-no inflammation or problems with pressure. He last saw her in July 2013 before the December 2013 accident.

After the accident, Dr. Menard next saw Ms. Villa in July 2014. At that time, Ms. Villa had the same problem in her right eye, just a more escalated version of it; more inflammation, more light sensitivity, and more pressure problems. Dr. Menard testified that even with very aggressive treatment, it was impossible to get the same level of control he had before. Dr. Menard also observed fresh bleeding in the eye causing him to opine that something new had happened and the lens had shifted even further. It was his opinion that Ms. Villa's new issues were caused by the facial trauma she experienced in the accident after the air bag deployed. At

5

that point, Ms. Villa's situation began to look like it might become more of a surgical case.

Dr. Thompson performed the surgery on Ms. Villa in June 2015 to replace the lens implant. Dr. Thompson did not perform the original surgery. Dr. Menard explained that Dr. Thompson removed the lens implant and sewed in a new lens implant. Dr. Menard testified that the surgery was successful.

Dr. Menard's testimony assisted the jury under the circumstances of this case. He was Ms. Villa's treating optometrist for many years before the accident and knew the circumstances surrounding her eye issues before and after the accident. Dr. Menard was in the truly unique position of knowing Ms. Villa's eye condition before the accident and the changes that occurred after the accident, necessitating the need for the new lens implant. Under the circumstances of this case, we do not find that the trial court abused its wide discretion in allowing Dr. Menard to testify regarding Ms. Villa's need for surgery caused by the accident.

## MEDICAL EXPENSES

Ms. Villa claims the jury erred in failing to award her all of her past medical expenses. Ms. Villa submitted medical bills totaling $47,509.55. The jury awarded $45,740.00 in past medical expenses.

A plaintiff's allegations that medical expenses were incurred as the result of an accident, which is supported by medical bills are sufficient to support the inclusion of that item in the judgment "unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident." *Barras v. Progressive Sec. Ins. Co.*, 14-898, p. 4 (La.App. 3 Cir. 2/11/15), 157 So.3d 1185, 1189, *writ denied*, 15-512 (La. 6/1/15), 171 So.3d 261 (quoting *Gradnigo v. Louisiana Farm Bureau,* 08-1198, pp.15-16 (La.App. 3 Cir. 3/4/09), 6 So.3d 367,

6

377). Failure "to award the full amount of medical expenses incurred as a result of the accident and proven by a preponderance of the evidence is an error by the trier of fact." *Id.*

None of the medical bills represent the difference of $1,769.55 between the amount of medical bills introduced into evidence and the amount awarded by the jury. At trial, the Defendants disputed that the accident caused the need for surgery to replace the lens in Ms. Villa's eye. The Defendants argued that Ms. Villa was already having problems with the lens placed in her eye before the accident and the surgery was inevitable. The total cost for this surgery was $2,340.00.

Obviously, the jury determined that the lens replacement surgery was at least partially necessitated by the accident because it did not reduce the award for medical expenses by the total cost of the surgery. We further note that the Defendants do not contest on appeal Ms. Villa's claim that she is entitled to an award for all past medical expenses. Therefore, we find it was error for the jury not to include an award for all past medical expenses and we will amend the judgment accordingly.

## GENERAL DAMAGES

Ms. Villa also argues that the general damages awarded to her should be increased to reflect the serious and lifelong consequences of her injuries. Ms. Villa claims that, given the serious and lasting nature of her injuries, an award of $260,000.00 is reasonable for her general damages, as opposed to $37,500.00 ($32,500.00 for past and future pain and suffering, $4,000.00 for past and future mental anguish, and $1,000.00 for past and future loss of enjoyment of life) awarded by the jury.

"In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." La.Civ.Code art. 2324.1. The supreme court recently granted writs to determine an appellate court's adjustment of damage awards in *Thibodeaux v. Donnell*, 16-570, p. 6 (La. 1/20/17), 219 So.3d 274, 278, wherein it restated the *Coco* Rule found in *Coco v. Winston v. Industries, Inc.*, 341 So.2d 332, 335 (La. 1976) (citations omitted) (alteration in original):

> [B]efore a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, ***and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.*** It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence.

We find that the jury abused its discretion in awarding Ms. Villa only $37,500.00 in general damages. Ms. Villa testified that she remembers a man knocking on her window at the scene of the accident but doesn't remember anything after that until she got in her room at the hospital. Ms. Villa's injuries due to this accident were numerous, and some were very serious. She suffered injuries all over her body including a head injury, worsening of neck pain, a displaced sternum fracture, with three rib fractures, three herniated lumbar discs, a large hematoma on her right hip, a sprain of the left knee, sprain and cartilage loss in the right knee, an avulsion fracture of her left ankle, and bruising and swelling of the right ankle. Eventually, Ms. Villa required eye surgery to replace the displaced lens in her right eye.

In addition to her physical injuries, Ms. Villa suffered mental anguish, loss of enjoyment of life, and pain and suffering after the accident, some of which she still suffers from today. When Ms. Villa was initially admitted to the hospital, she was confined to a bed in a room full of roaches. She could not move due to extreme pain and the fact that she was on a catheter. Ms. Villa was moved to a new room after two days. She was released from the hospital after four days and slept in a recliner at her house for about two months. Ms. Villa did not return to work for three months. She could not drive for nearly four months because she had to wear a boot for her fractured ankle. Her family had to help her with personal grooming, house and yard work.

While Ms. Villa testified that she can now do most of the things that she could do prior to the accident, she still has some residual issues. Ms. Villa's chest still bothered her when she turned a certain way while she slept. Her right knee occasionally bothers her. Her left ankle also still gives her problems.

Ms. Villa admitted that she suffered with neck pain prior to the accident but only on the left side. After the accident, she began to suffer with right-sided symptoms in addition to worsening of her neck pain. The herniated lumbar discs were new issues caused by the accident. She was also involved in two additional car accidents but suffered no injuries in those accidents.

Based on the record, we find that the jury's award for $32,500.00 for past and future pain and suffering is abusively low. Once an appellate court determines that the trier of fact abused its discretion in its award of general damages, it may examine prior awards for purposes of determining the highest or lowest point of an award that could reasonably be granted. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

After reviewing prior awards in similar cases, we find that $250,000.00 is the lowest reasonable award that the jury could have awarded for Ms. Villa's numerous and serious injuries, which for the most part were completely healed by the time of trial three years later. *Dowden v. Mid State Sand & Gravel Co., Inc.*, 95-231 (La.App. 3 Cir. 11/2/95), 664 So.2d 643, *writ denied*, 95-2864 (La. 2/2/96), 666 So.2d 1099 ($100,000.00 in general damages awarded for abrasions, a laceration to the chin, a bruise over the left anterior chest wall, a deep laceration to the central part of the right knee, and comminuted fracture of the right hip-joint socket which required an open reduction internal fixation, including the use of a plate and screws); *Pannell v. Encompass Ins. Co.*, 06-1601 (La.App. 3 Cir. 5/2/07), 956 So.2d 152 ($90,000.00 in general damages for soft tissue injuries to neck and shoulder with aggravation of a pre-existing low back condition); *Kerrigan v. Imperial Fire and Cas. Ins. Co.*, 99-603, 99-604 (La.App. 3 Cir. 11/3/99), 748 So.2d 67, *writ denied*, 99-3410 (La. 2/4/00), 754 So.2d 236 ($175,000.00 in general damages for cervical strain, one herniated lumbar disc which required future surgery, concussion, severe laceration to forehead, contusions and abrasions to the knees, strain of right shoulder, fracture of left fibula near the knee); *Cox v. Shelter Ins. Co.*, 09-958 (La.App. 3 Cir. 4/7/10), 34 So.3d 398, *writ denied*, 10-1041 (La. 9/17/10), 45 So.3d 1044 ($250,000.00 in general damages for protruding thoracic disc causing ongoing daily problems lifting children, pain when sitting or standing, and severe headaches); *Hebert v. Veterans Veterinary Hosp., Inc.*, 96-779 (La.App. 5 Cir. 4/9/97), 694 So.2d 993 ($165,000.00 in general damages for trimalleolar fracture of three bones comprising ankle requiring two surgeries, in a wheelchair and had to use crutches and a walker during rehabilitation, required

nonsurgical medical care for the rest of life, and could no longer help in family business or do normal household chores).

## PAST LOST WAGES

On appeal, Ms. Matte argues that Ms. Villa did not lose wages as a result of the accident and she should not have been allowed to assert a lost wage claim. Ms. Villa claims that the collateral source rule prevents Ms. Matte from using her employment benefits as a discount.

> The collateral source rule is a doctrine of common law origin, jurisprudentially imported into the law of this state. Basically, the rule provides that "a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution." Under the collateral source rule, payments received from an independent source are not deducted from the award the aggrieved party would otherwise receive from the wrongdoer. As a result, the tortfeasor is not allowed to benefits from the victim's foresight in purchasing insurance and other benefits.

*Bellard v. Am. Cent. Ins. Co.*, 07-1335, 07-1399, p. 18 (La. 4/18/08), 980 So.2d 654, 667-68 (citations omitted) (footnote omitted); *See also Royer v. State Dep't of Transp. & Dev.*, 16-534 (La.App. 3 Cir. 1/11/17), 210 So.3d 910, *writ denied*, 17-288 (La. 4/24/17), 221 So.3d 69.

At the time of the accident, Ms. Villa was working at Elmer's Radiator Shop, which was owned by her parents. She worked there since graduating from high school in 1979. Her duties included handling accounts receivable, payables, payroll, customer service, and other miscellaneous duties. Ms. Villa's mother, Lollion Elmer, testified that in the past her daughter only missed some work for some surgeries but otherwise did not miss much work before this accident. Ms. Elmer testified that there was no set vacation or sick leave time at the shop but Ms. Villa could not just take unlimited time off and continue receiving her wages. As a

small family business, all employees were paid when they had to take time off for sick leave.

In *Bozeman v. State*, 03-1016 (La. 7/2/04), 879 So.2d 692, the supreme court cited the fourth circuit's case of *Bryant v. New Orleans Pub. Serv. Inc.*, 406 So.2d 767 (La.App. 4 Cir. 1981), *judgment affirmed,* 414 So.2d 322 (La.1982), and recognized that the collateral source rule did apply, not only where the plaintiff directly purchased insurance against which the plaintiff recovered, but also where the plaintiff received benefits from gratuitous sources such as Medicaid payments.

More recently, in *Royer v. State Dep't of Transp. & Dev.*, 210 So.3d at 910, this court, in addressing whether the collateral source rule applied to the payment of workers' compensation benefits from an employer to an employee for damages sustained in a vehicle accident caused by the Louisiana Department of Transportation and Development, held:

> If the primary goal of the collateral source rule is tort deterrence, the collateral source rule applies to a tortfeasor, even if consideration, in the form of policy payments, is non-existent, as will always be the case when a workers' compensation carrier is the collateral source. We find that the overriding policy of tort deterrence outweighs the concern of double recovery.

We first observe that Ms. Villa did not receive a "windfall," as she earned the ability to take off work and receive compensation for time off due to her long-time employment with Elmer's. As testified to by Ms. Elmer, this was a benefit provided to all employees when it was needed but it was not an indefinite benefit.

Furthermore, even if we were to consider that Ms. Villa did not earn the ability to take off time with compensation, we agree with the court's reasoning in *Lee v. Cook*, 482 So.2d 760, 763 (La.App. 5 Cir.), *writ denied*, 484 So.2d 137

(La.1986) (citing *Wallace v. Pan American Fire & Cas. Co.*, 352 So.2d 1048 (La.App. 3 Cir. 1977)):

> [U]nder the collateral source rule in an action in tort by an injured employee against a third-party tort-feasor, where the tort-feasor is established and the employer does not intervene for reimbursement of compensation benefits paid, the plaintiff is entitled to recover the full amount of damages sustained by him without deduction of the amounts he has received from his employer as compensation benefits.

Elmer's Radiator Shop made no claim for reimbursement of wages paid to Ms. Villa when she was off work due to the accident.

For these reasons, we find that the trial court was correct in applying the collateral source rule. Ms. Villa is entitled to recover damages for past loss wages.

## INSURANCE COVERAGE

In its appeal, GEICO states that the trial court correctly found that sufficient evidence existed to prove that notice of cancellation for nonpayment of premium was mailed on July 25, 2013. However, GEICO claims that the trial court erred in concluding that La.R.S. 22:1266 imposes a burden of proving delivery of notices of cancellation for nonpayment when proof of mailing is established.

At the bench trial on the issue of insurance coverage, the following testimony and evidence were introduced. Kim Jones, a coverage underwriter with GEICO, testified that the policy was originally issued to Mr. Jeyrl Clack for a 2007 Chevy. The account was set up for the premium to be paid by an electronic funds transfer. Mrs. Clack was added in December 2011. Her 2007 Chevy was added in July 2012.

In August 2012, the account number was changed for the automatic drafts and it came back from the bank as an invalid account number. GEICO sent out bills, and payment was made in September by a check for a partial amount. The

rest of the amount was paid online a couple of weeks later. That payment was also returned for an invalid account number. The Clacks then reenrolled in electronic funds transfer, which then proceeded smoothly.

The 2010 Chevy that was involved in the accident, and driven by Ms. Matte, was added to the policy in February 2013. Ms. Matte is Mrs. Clack's mother. On July 15, 2013, Mrs. Clack went online and removed the two 2007 Chevy vehicles. At the same time, the account number for the electronic funds transfer was changed. GEICO sent a letter to the Clacks informing them that account information was changed. GEICO tried to extract payment on July 21, 2013, but it was returned for invalid account number.

On July 25, 2013, GEICO sent a "NOTICE OF CANCELLATION FOR NONPAYMENT OF PREMIUM" letter to the Clacks informing them that it needed payment by August 5 or the policy was canceled. No premium was received, so on August 9, 2013, GEICO mailed the Clacks a "BALANCE DUE ON CANCELED POLICY" letter informing them that they owed $87.06 for "earned premium." On August 30, 2013, another letter was mailed to the Clacks informing that the policy canceled on August 5, 2013, and they still had an account balance of $87.06. An additional letter was mailed to the Clacks on September 20, 2013, advising them of the policy balance of $87.06. A "FINAL NOTICE" was mailed to the Clacks on October 11, 2013, reminding the Clacks of the balance on their policy and informing them that if payment was not received by October 24, 2013, the account would be referred to a collection agency.

Ms. Jones testified that GEICO received no other correspondence after the account was turned over to a collection agency until December 10, 2013, when it received a call to reissue the policy. Payment was made over the phone at 8:59

14

a.m. central time. The accident occurred around 8:00 a.m. The policy was then reinstated. The new policy had effective dates of December 11, 2013 to June 11, 2014.

Mrs. Clack testified that they never received notice that the insurance was being canceled. She further testified that she had no recollection of receiving any correspondence from GEICO. She testified that she did not get the mail from the mailbox because her mother, who lives in an apartment connected to the main house, would get the mail from a joint mailbox. Her mother would go through her mail and place the mail on a table by the door. Mrs. Clack also had a friend who was often at the house and would get the mail and also place it on the table.

Mrs. Clack testified that she did receive the collection letter and called the next day about it and paid to get coverage reinstated on her mother's car. This was her first notice that the insurance had been canceled. Mrs. Clack explained that she only checks the daily balance in her checking account and doesn't balance the checkbook every month so she would not have known that the premium had not been paid since July 21, 2013. Mrs. Clack testified that she called to reinstate the policy the day after she received the collection letter but before she allegedly knew about the accident.

Donna Truslow, the output manager and postal administrator for GEICO, testified about the process that the notice of cancellation letter went through at the Fredericksburg, Virginia facility. She explained that the facility processes, prints, sorts, and mails customer documents. Daily files are received electronically into the print queue. Different batches are assigned to different printers. Once a batch is printed, it goes to the insertion stage. Intelligent, barcode-driven equipment reads the barcodes that are on the documents and inserts them into envelopes based

15

on the barcode. It is kept in order based on the Post Office Receipt Secured (PORS) listing, which is a proof of mailing method. The PORS listing is also printed at the facility. The envelopes are then placed into trays, with sleeves on top to keep everything in order. A verification process occurs to ensure that everything is kept in order of the way that it is printed and prepared on the PORS listing.

Once the letters are in the trays, they are placed in carts which are picked up by a transportation driver. The driver signs a pick-up slip of how many trays are being picked up. Ms. Truslow explained that there is no pick-up slip for this particular notice of cancellation because they dispose of them after a certain period of time due to storage issues.

Ms. Truslow explained that additional fees are paid to the United States Postal Service to mail documents using the PORS process. Once all items are verified, they are taken to the postal clerk on site in Ashland, Virginia for acceptance and to make sure that everything is in order as on the PORS listing. Ms. Truslow explained that a pick-up slip is not necessary because the postal clerk has accepted that particular notice of cancellation by stamping the postal PORS list indicating acceptance. The letters are then handed over to Pitney Bowes who pre-sorts the documents according to zip code while the documents are still in the postal service's custody. The items are then placed for delivery. Ms. Truslow explained that the date on the letter and the date of mailing must be the same or the post office will not accept it if it is a PORS document.

Louisiana Revised Statutes 22:1266(D)(1) (emphasis added) provides for notice of cancellation of insurance for nonpayment of premium as follows, in pertinent part:

16

No notice of cancellation of a policy to which Subsection B or C of this Section applies shall be effective unless mailed by **certified mail or delivered** by the insurer to the named insured at least thirty days prior to the effective date of cancellation; **however, when cancellation is for nonpayment of premium at least ten days notice of cancellation accompanied by the reason shall be given**. In the event of nonpayment of premiums for a binder, a ten-day notice of cancellation shall be required before the cancellation shall be effective. **Notice of cancellation for nonpayment of premiums shall not be required to be sent by certified mail.**

In the present case, the trial court found sufficient evidence based on the testimony and evidence that notice was properly mailed. No one has contested this finding on appeal. In addressing the issue of delivery, the trial court recognized that Mrs. Clack testified that she never received the notice of cancellation in the mail. The trial court then considered the other letters sent by GEICO after the notice of cancellation and addressed the issue of whether notice of cancellation was properly delivered. The trial court concluded that La.R.S. 22:1266(D)(1) required notice to the insured ten days before the cancellation was effective. The trial court determined that it was impossible for the letter to arrive ten days before the effective cancellation day of August 5, 2013, if it was mailed on July 25, 2013. The trial court specifically made a finding that it was impossible for the notice of cancellation, at the time it was mailed, to have provided the requisite ten-day notice, so that cancellation under Louisiana Law was not proper. Therefore, the trial court found that the GEICO policy provided coverage for the accident.

In *Johnson v. Louisiana Farm Bureau Casualty Ins. Co.*, 11-476 (La. 5/6/11), 60 So.3d 607, the supreme court addressed the issue of whether notice of

nonrenewal of a homeowner's insurance policy under La.R.S. 22:1335[1] required that it simply be mailed to the insured at the address shown on the policy or whether it must actually be delivered in order to be effective. The supreme court held that:

> The key is that the statute requires only mailing, not proof of receipt. Any evidence of non-delivery is relevant only as far as it is evidence of non-mailing or improper mailing, which is an issue for the fact finder to resolve.
>
> In this case, the jury found that Farm Bureau had properly mailed the notice of nonrenewal, even after taking into consideration that the plaintiff did not receive the notice. This finding ended the jury's fact finding duty, and the fact that the plaintiff did not receive the notice was otherwise irrelevant. Farm Bureau did all that it was required to do under La.R.S. 22:1335 in order to give notice of nonrenewal of the homeowner's insurance policy.

*Johnson*, 60 So.3d at 608-09 (footnote omitted).

The court in *Johnson* decided that non-delivery only mattered insofar as it established non-mailing or improper mailing.

In the present case, La.R.S. 22:1266(D)(1) only requires that notice of cancellation for nonpayment of premiums be mailed or delivered, as certified mail is not required. There is no dispute that the trial court found that notice of cancellation sent by GEICO was properly mailed. Therefore, whether the notice was actually delivered does not matter.

We do find that the trial court erred in finding that the notice was not timely mailed. Louisiana Revised Statutes 22:1266(J) (emphasis added) provides that: "Where written notice of cancellation or nonrenewal is required and the insurer elects to mail the notice, the running of the time period between the date of mailing

---

[1] La.R.S. 22:1335(A) provided that: "The notice of nonrenewal shall be mailed or delivered at least thirty days before the expiration date of the policy."

and the effective date of termination of coverage **shall commence upon the date of mailing**."

Ms. Villa argues that this court should not take into account La.R.S. 22:1266(J) because it was not raised by GEICO in the trial court and cannot be raised for the first time on appeal. The issue of whether notice of cancellation was timely was an issue in the trial court so it is not raised for the first time on appeal. Furthermore, La.R.S. 22:1266 is at the heart of the issue concerning coverage in this case and the trial court considered it in making its decision. Therefore, we find that the applicability of La.R.S. 22:166(J) is properly before this court. *Harrah's Bossier City Inv. Co., LLC v. Bridges*, 09-1916 (La. 5/11/10), 41 So.3d 438.

Pursuant to La.R.S. 22:1226(J), notice was timely mailed on July 25, which would be the start of the ten-day period. The tenth day would be August 3, which is clearly ten days before the cancellation date of August 5.

Ms. Villa also argues that notice had to be by certified mail or delivery because the electronic funds transfer was a negotiable instrument. Ms. Villa claims that the order and authorization by providing the bank account information online to instruct withdrawal by GEICO of a monthly payment is a negotiable instrument pursuant to La.R.S. 10:3-104.

Louisiana Revised Statutes 22:1266(D)(3)(a)(i) and (ii) provide when payment is made by "check or other negotiable instrument" and it is returned, then:

> The insurer shall immediately, and in no case later than ten days after the producer or premium finance company has notified the insurer, notify the named insured, by certified mail or delivering to the name insured a written notice that the policy is canceled from the date the premium payment was due.

"To be classified as a negotiable promissory note, the entire writing must be examined in order to determine whether the requisite formalities have been

19

fulfilled." *Bridges v. Bridges*, 96-1191, p. 6 (La.App. 3 Cir. 3/12/97), 692 So.2d 1186, 1190. In the present case, the actual order and authorization were not introduced into evidence so we cannot determine whether it was a negotiable instrument or not. Therefore, we do not address this argument.

For the reasons set forth in this opinion, we amend the judgment to increase the awards of medical expenses to $47,509.55 and general damages for past and future pain and suffering to $250,000.00. We also reverse the judgment insofar as it casts GEICO General Insurance Company in judgment for this accident. We find that the notice of cancellation sent by GEICO General Insurance Company was effective and there was no coverage for this accident and dismiss all of Pamelia Villa's claims against it. In all other respects, the judgment of the trial court is affirmed.

Costs of this appeal are assessed to Marie Matte.

**REVERSED IN PART; AFFIRMED AS AMENDED.**

**Conery, J., concurs in part and dissents in part and assigns reasons.**

I agree with the majority's opinion except for the increase in general damages. While I do agree that the general damages for this deserving plaintiff are very low for injuries of the magnitude sustained by her in this collision and for her past, present and future physical and mental pain and suffering, it is difficult to overturn the jury's verdict considering our limited role in reviewing jury awards. *See Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592 (La. 12/8/15), 193 So.3d 1110. I would further agree that the general damages award *should have been* in the $250,000.00 range based on the record in this case. However, based on the constraints placed on appellate courts' review of jury awards, I am constrained to accord the jury deference to its credibility and fact-finding functions. Reluctantly, I dissent from the majority's decision to increase general damages. In all other respects, I concur with the majority's opinion.